UNITED STATES of America, Plaintiff–Appellee,

v.

Kathy J. HATHCOAT, Defendant–Appellant.

No. 93–3869.

United States Court of Appeals, Seventh Circuit.

Argued June 15, 1994.

Decided July 28, 1994.

Susan H. Dowd, Asst. U.S. Atty., Indianapolis, IN (argued), for U.S.

Stuart T. Bench, Indianapolis, IN (argued), for Kathy J. Hathcoat.

Before ESCHBACH, EASTERBROOK and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

Kathy Jean Hathcoat, previously a bank teller at the Markleville Branch of the Pendleton Bank Company, in Pendleton, Indiana, pled guilty to a single count information charging her with embezzlement of bank funds in violation of 18 U.S.C. § 656. The

district court sentenced her to eighteen months' imprisonment, five years' supervised release, and three hundred fifty hours' community service. It further ordered Ms. Hathcoat to pay $21,000 in restitution. On appeal, Ms. Hathcoat contends that the district court erroneously increased her offense level under U.S.S.G. § 3B1.3. Because we are unable to determine from the record before us whether the district court improperly interpreted the term "position of trust" as used in § 3B1.3, we vacate the sentence and remand the case for further proceedings.

# I

## BACKGROUND

### A. Facts

In the plea agreement, Ms. Hathcoat admitted to the facts as set forth in Count I of the information filed against her. We therefore shall rely on the operative paragraphs of that information, as supplemented by the testimony of Ms. Hathcoat and of the investigating special agent of the Federal Bureau of Investigation, to detail the methods employed by Ms. Hathcoat and her supervisor, branch-manager Mary Jane Cooper, to embezzle monies from their employer.

In or around March 1990, Ms. Hathcoat began to embezzle funds belonging to the Pendleton Banking Company. Her efforts were discovered by her branch manager, Cooper. However, rather than report the embezzlement to a higher bank authority, Cooper agreed to assist Ms. Hathcoat in further embezzlement from the bank. The embezzlement continued until March 1992, when it was discovered during a branch audit. The total amount of funds embezzled by Cooper and Ms. Hathcoat from the Pendleton Banking Company was $199,622.34. Various methods were used to accomplish the embezzlement, and these methods became progressively more complex over time. Both Cooper and Ms. Hathcoat took cash from their teller drawers and did not report this loss on their cash totals provided to the main branch. The amount reported to the main branch was the total amount that should have been in those drawers if neither conspirator had taken any money. Both Cooper

and Ms. Hathcoat verified for each other that the cash drawers were in balance, when in fact they were not. At the time of the discovery by bank officials in March 1992, the total cash shortage taken by Cooper and Ms. Hathcoat from the cash drawers for their personal use was $7,901.00.

Both Cooper and Ms. Hathcoat also took cash from the vault in the branch office and did not report this taking on the vault ledger. The actual cash amount contained in the vault was therefore less than the amount reflected on the records maintained at that branch and reported to the main office. The two kept only a minimum amount of cash in the vault to keep the branch operational; vault totals provided to the main office, however, were much higher than the amounts the two were supposed to keep in the vault to conform to bank policy. At times, in order to have enough cash to meet customer needs, Cooper had to obtain cash from other banking institutions by preparing bank cashier's checks that were made payable to herself. She then went to other banking institutions, because her request for cash from the main office of the Pendleton Banking Company would have alerted officials to some irregularity in the cash vault at Markleville.

Cooper and Ms. Hathcoat were aware of the dates when officials would be present in the branch to conduct audits of the cash vault. In order to hide their theft from the cash vault, Cooper and Ms. Hathcoat prepared cash drawers and/or vault "out" entries and supported them with fictitious cashier's checks. These documents were presented to the bank auditors, who would count the cash and "out" entries together and balance them with the ledger totals. Sometimes the two would prepare these cashier's checks and "out" entries prior to the arrival of the auditors at the bank. On other occasions, the entries were prepared while the auditor was at the bank. At the time of the discovery by bank officials in March 1992, the total amount of cash shortage from the vault taken by the two defendants for their own personal use was $63,000.00.

As the cash vault totals reported to the main office increased to cover the accumulating shortages taken by the two, main office

management began to criticize them for keeping more money in the vault than bank policy required. In order to hide the amounts of money they continued to take from the cash vault, they began to perpetrate an internal bank cashier's float. They accomplished this scheme because they were aware that the central bookkeeping of the main branch balanced outstanding cashier's checks on each Friday and any imbalance would not be discovered until then. Cashier's checks, which would represent a reduction in vault totals, were prepared by the two. These cashier's checks showed the names of real people as the remitter and payee but were fraudulently endorsed by the defendants. Checks would show as being "cashed" on a certain day, but no credit entry to the cashier's checks outstanding account was entered until just prior to the Friday balancing of central bookkeeping. The two would then prepare the new cycle of additional checks to balance the transaction with the credit entries. The result was approximately a one-week imbalance lag, which represented additional funds removed from the vault. At the time of discovery by bank officials in March 1992, the total cashier's check imbalance was $33,000.00.

Finally, Cooper and Ms. Hathcoat issued a total of nineteen loans in the names of their relatives and of bank customers. Cooper and Ms. Hathcoat received the proceeds of all of these loans and used the proceeds for their personal benefit. None of the people in whose names those loans were made was ever aware of the loans or received any proceeds from them. The two obtained credit information, prepared file documentation, including applications and credit histories, and fraudulently executed the documentation and promissory notes by forging the signatures of the people in whose names the loans were made. They effected loan renewals prior to the time that a "due notice" would be mailed from the main office to ensure further that the people in whose names the loans were made would not become aware that a loan existed in their own names. The two confederates used a post office box at Markleville to receive mail regarding these loans in order to avoid detection either by the main office staff or by the people in whose names

the loans are made. They also made small payments on some of these loans to further avoid detection, and in some cases used the proceeds of one fraudulent loan to pay off another fraudulent loan. At the time of detection by bank officials, the total fraudulent loan loss to the bank on account of this scheme was $95,721.34.

### B. *Ruling of the District Court*

In imposing sentence, the district court ruled that the base sentence for embezzlement be enhanced by two levels pursuant to U.S.S.G. § 3B1.3. That provision allows for imposition of the enhancement if the district court finds that "the defendant abused a position of public or private trust, or used a special skill in a manner that significantly facilitated the commission or concealment of the offense." In imposing this enhancement, the district court rejected Ms. Hathcoat's argument that she had the responsibilities of a bank teller and had therefore neither abused a trust nor used a special skill in perpetrating the embezzlement. We shall discuss the methodology of the district court in more detail as we analyze the contentions of the defendant on appeal.

## II

## ANALYSIS

### A

It is helpful to an understanding of the issue before the court to recall briefly the history of the "abuse of trust" enhancement with respect to the crime of embezzlement. This court has stated in dicta that enhancement for abuse of trust is not applicable to embezzlement. *See United States v. Jimenez*, 897 F.2d 286, 287 (7th Cir.1990); *cf. United States v. Herrera*, 878 F.2d 997, 1001 n. 3 (7th Cir.1989) (stating, without specific reference to embezzlement, that § 3B1.3 is designed to prevent double counting and thus may not be employed if an abuse of trust is included in the base offense level). The Ninth Circuit, specifically referring to these two cases, held to the contrary. It reasoned that § 3B1.3 is applicable to embezzlement because § 2B1.1, covering embezzlement,

does not include abuse of trust in the specific offense characteristic. *See United States v. Drabeck,* 905 F.2d 1304, 1306, *reh'g granted,* 915 F.2d 1404 (9th Cir.1990), *aff'd,* 944 F.2d 910, *redesignated,* 946 F.2d 629 (9th Cir. 1991). No other Seventh Circuit cases cite either *Jimenez* or *Herrera* for this proposition; nor do other cases of this circuit discuss whether § 3B1.3 applies to defendants convicted of embezzlement. However, in *United States v. Lamb,* 6 F.3d 415, 421 (7th Cir.1993), this court applied, without discussion of *Jimenez,* the enhancement to a defendant charged with embezzlement of mail in violation of 18 U.S.C. § 1709. Moreover, as we shall discuss later, it appears that all circuits that have had to confront the issue now take the view that the abuse of trust enhancement may be applied at least to some defendants convicted of embezzlement. An examination of how the weight of authority evolved to this position, despite the dicta in our earlier cases, serves as a helpful predicate to our examination of the precise issue before us.

The Guidelines make clear that the abuse of trust enhancement is not applicable if abuse of trust or skill "is included in the base offense level of the specific offense characteristic." U.S.S.G. § 3B1.3. This exclusion prevents a defendant's being punished twice for the same conduct. By its definition, embezzlement requires a finding of a breach of trust. *See Moore v. United States,* 160 U.S. 268, 269, 16 S.Ct. 294, 295, 40 L.Ed. 422 (1895) (defining embezzlement as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come"); Barron's Law Dictionary (1984 ed.) (defining embezzlement as "the fraudulent appropriation to one's own use of property lawfully in his possession"). Thus, at first glance, by definition embezzlement would seem to fall within the category of offenses that the Guidelines exclude from the abuse of trust enhancement. In applying the enhancement to embezzlement, however, the courts of appeals have employed two rather separate analytical frameworks. One approach looked to the elements of the underlying offense of embezzlement and distinguished *breach* of trust and *abuse* of trust. The other approach focused on the guideline base offense level and specific offense characteristics.

*United States v. Georgiadis,* 933 F.2d 1219 (3d Cir.1991), exemplifies the first approach. In *Georgiadis,* the defendant argued that an abuse of trust was an element of embezzlement and therefore was incorporated into the base offense level for embezzlers. The Third Circuit disagreed.

While embezzlers like Georgiadis may indeed breach a duty of trust by fraudulently appropriating the property of another, *see, United States v. Sayklay,* 542 F.2d 942, 944 (5th Cir.1976) ("The essence of embezzlement lies in breach of a fiduciary relationship deriving from the entrustment of money."), an abuse of trust under the Guidelines requires something more. Abuse of a position of trust has specific Guidelines meaning: "[t]he position of trust must have contributed in some substantial way to facilitating the crime and not merely have provided an opportunity that could as easily have been afforded to other persons." *See,* U.S.S.G. § 3B1.3, Commentary, Application Note 1. Since it is not necessary for the government to prove an *abuse* of trust (within the meaning of the Guidelines) in order to convict under 18 U.S.C. § 656, we reject Georgiadis' theory that an abuse of trust is, for purposes of the Guidelines, an element of embezzlement already taken into account by the base offense level of four imposed by U.S.S.G. § 2B1.1(a).

*Georgiadis,* 933 F.2d at 1225. Under this interpretation, § 3B1.3 is applied to embezzlers whose crime involved more culpable conduct than a simple breach of trust. This view finds further support in the statement in the commentary to § 3B1.3 that the enhancement may be applied only when the position of trust contributed in some "*substantial*" way to facilitating the crime. U.S.S.G. § 3B1.3 (1992) (emphasis added). The Second, Fifth, Ninth, and Tenth Circuits have followed this reasoning. *See United States v. Fisher,* 7 F.3d 69, 70 (5th Cir.1993) (per curiam) (applying enhancement to one who embezzled government property and "occupied a superior position, relative to all people in a position to commit the offense as

a result of her job"); *United States v. Chimal*, 976 F.2d 608, 613–14 (10th Cir.1992) ("Although embezzlement by definition involves an abuse of trust, embezzlement by someone in a significant position of trust warrants the enhancement when the position of trust substantially facilitated the commission or concealment of the crime."), *cert. denied*, — U.S. ——, 113 S.Ct. 1331, 122 L.Ed.2d 715 (1993); *United States v. Christiansen*, 958 F.2d 285, 287 (9th Cir.1992) (applying enhancement to embezzlement of credit union funds in violation of 18 U.S.C. § 657 by credit union manager); *United States v. McElroy*, 910 F.2d 1016, 1027–28 (2d Cir.1990) (allowing enhancement because, although not all the positions listed in 18 U.S.C. § 656 are necessarily positions of trust, "defendants used their positions as the chief officers of their respective banks to facilitate their misapplications of bank funds in ways that many lower-level officers, or employees, or those connected with the bank in some capacity other than officer, director, employee, or agent, could not have done").

In contrast, in *United States v. Levy*, 992 F.2d 1081, 1084 (10th Cir.1993), a case in which the enhancement was applied to a trustee convicted of embezzlement in violation of 18 U.S.C. § 153, the Tenth Circuit reasoned that whether an enhancement for abuse of a position of trust was appropriate depended on the "base offense level and specific offense characteristics assigned by the

guidelines to the crime of conviction" and not on "the elements of the offense itself." The Eighth and Ninth Circuits have also utilized this reasoning. *See United States v. Ajiboye*, 961 F.2d 892, 895 n. 4 (9th Cir.1992) (stating that § 2B1.1(b)(1) ("Larceny, Embezzlement, and Other Forms of Theft") of the Guidelines does not include an "abuse of trust or skill" in it and therefore § 3B1.3 may be applied to crimes covered by § 2B1.1(b)(1)); *accord United States v. Lange*, 918 F.2d 707, 710 (8th Cir.1990) (same).[1]

The confusion obvious in the disparity of the approaches of the circuits was a mirror of the halting attempt of the Sentencing Commission to provide guidance on the appropriate use of this enhancement. In earlier editions of the Guidelines, the commentary contained the following application note:

> The position of trust must have contributed in some substantial way to facilitating the crime and not merely have provided an opportunity that could as easily have been afforded to other persons. This adjustment, for example, would not apply to an embezzlement by an ordinary bank teller.

U.S.S.G. § 3B1.3 (1992). As this court pointed out in *United States v. Lamb*, 6 F.3d 415, 420 (7th Cir.1993), this rather laconic explanation on the part of the Commission produced more confusion than elucidation. Other circuits similarly questioned the logic of the bank teller exclusion.[2] Our own unhappi-

---

**1.** The Ninth Circuit case that cited *Jimenez* and *Herrera* held that § 3B1.3 may be applied to embezzlement because § 2B1.1, which covers embezzlement, does not include abuse of trust as a specific offense characteristic, nor does the commentary to § 2B1.1 specifically address whether § 3B1.3 applies. *See United States v. Drabeck*, 905 F.2d at 1306.

**2.** *See, e.g., United States v. Castagnet*, 936 F.2d 57, 61 (2d Cir.1991) ("We are somewhat at a loss to understand why the sentencing commission believes that an ordinary bank teller who embezzles should not receive the enhancement.") (quoting *Drabeck*, 905 F.2d at 1306); *Drabeck*, 905 F.2d at 1306–07 ("We can only conclude that the United States Sentencing Commission must have meant that a position of trust occupied by an 'ordinary' teller does not contribute to the crime of embezzlement or its concealment in a 'substantial' enough manner."). The D.C. Circuit also appeared to question, but followed, the bank teller exception. *See United States v.*

*Smaw*, 993 F.2d 902, 905–06 (D.C.Cir.1993) (stating that "we do not see how the government's argument [for a broad interpretation of the phrase "position of trust"] can be squared with the bank teller example used in the commentary" and expressing "doubt that banks or bank depositors would agree that they need not put trust in bank tellers"); *cf. United States v. Brown*, 941 F.2d 1300, 1305 n. 6 (5th Cir.1991) (recognizing that "[s]ome courts either fundamentally disagree with the bank teller example or attempt to explain it by suggesting that a teller's position of trust may already be an element of the offense of embezzlement and therefore already included in the base offense level"), *cert. denied*, — U.S. ——, 112 S.Ct. 648, 116 L.Ed.2d 665 (1991).

The Tenth Circuit followed the bank teller exception and attempted to reconcile it with the language of the Guideline. *See United States v. Johnson*, 4 F.3d 904, 916–17 (10th Cir.1993) (affirming application of § 3B1.3 to defendant convicted of embezzlement while employed as a

ness with the categorical exception for bank tellers in the earlier commentary was expressed in a more specific critique by the Third Circuit, a critique that pointed the way to the resolution of the matter. In *United States v. Craddock*, 993 F.2d 338 (3d Cir. 1993), the Third Circuit reasoned that

[t]he presence of the independent requirement of significant facilitation [in the language of the Guideline] implicitly recognizes that a job may have trust and nontrust aspects. The ordinary bank teller, when engaged in the activity of taking cash from the till or putting it in, is not utilizing a position of trust. The same teller, however, may engage in other activities in the course of his job that do involve aspects of trust, and these may be exploited to facilitate a crime.

993 F.2d at 343 (footnote omitted). The court concluded that tellers were not *per se* exempt from application of the enhancement.

Rather, the standard for tellers, ... and all other defendants, is (1) whether the authority conferred and the absence of controls indicate that the employer relied on the integrity of the defendant to protect against the loss occasioned by the crime; and (2) whether the trust aspect of the job made the commission or concealment of the crime significantly easier.

*Id.*

The approach of the Third Circuit was the approach taken by the Commission in its revision of the commentary:

"Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose respon-

sibilities are primarily nondiscretionary in nature. For this enhancement to apply, the position of trust must have contributed in some significant way to facilitating the commission or concealment of the offense (*e.g.*, by making the detection of the offense or the defendant's responsibility for the offense more difficult). This adjustment, for example, would apply in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment would not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

Notwithstanding the preceding paragraph, because of the special nature of the United States mail an adjustment for an abuse of a position of trust will apply to any employee of the U.S. Postal Service who engages in the theft or destruction of undelivered United States mail.

This amendment reformulates the definition of an abuse of position of trust to better distinguish cases warranting this enhancement. The effective date of this amendment is November 1, 1993.

U.S.S.G. App. C at 339 (1993) (emphasis omitted).

This amendment to the commentary brings significant clarification to the Commission's work with respect to the enhancement for abuse of trust. It ensures that the enhancement is imposed in a manner that is compatible with the nature of the crime of embezzlement, a crime that, as we have noted earlier, always involves a *breach* of trust but oftentimes involves an even more egregious *abuse* of trust that warrants a greater punish-

vault teller; vault teller "was not an ordinary teller ... the bank entrusted her with responsibilities beyond those of the other tellers"), *cert. denied,* —— U.S. ——, 114 S.Ct. 1082, 127 L.Ed.2d 398 (1994); *see also United States v. Fisher,* 7 F.3d 69, 70 (5th Cir.1993) (affirming application of § 3B1.3 to defendant who was convicted of embezzlement while employed as a head bank cashier whose "duties and responsibilities as head cashier went significantly beyond

the duties of an ordinary bank teller," but not explicitly referencing the Commentary); *United States v. Cuff,* 999 F.2d 1396, 1397 (9th Cir.1993) (reversing application of § 3B1.3 to postal employee found guilty of theft of mail in violation of 18 U.S.C. § 1709 and "fail[ing] to see any significant distinction between the bank teller who embezzles funds and Cuff, who stole mail packages while employed in unloading them and moving them into the workroom").

ment—the punishment permitted by this enhancement.

B

Ms. Hathcoat was sentenced on November 19, 1993. According to U.S.S.G. § 1B1.11, the "court shall use the Guidelines Manual in effect on the date that the defendant is sentenced" unless doing so would violate the ex post facto clause of the Constitution of the United States. *See United States v. Seacott,* 15 F.3d 1380, 1386 (7th Cir.1994). Therefore, even if the new version of U.S.S.G. § 3B1.3 were construed as altering the law rather than clarifying it, we would apply the new commentary in this case and require that the government shoulder the burden of establishing that there has been not only a *breach* of trust but also an *abuse* of trust. The government does not dispute that it has this obligation. Indeed, in the district court, the government attempted to establish that Ms. Hathcoat's crime was the result of her holding a position of professional or managerial discretion that subjected her to far less supervision than that imposed on the conventional bank teller. This freedom of action, contended the government, facilitated the commission of the offense by making the detection of the offense more difficult.

■ Section 3B1.3 allows for a two-level enhancement "if the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. Application of § 3B1.3 requires two findings: (1) the defendant occupied a position of trust, and (2) the defendant abused his or her position in a manner that significantly facilitated the commission or concealment of the offense. *United States v. Boyle,* 10 F.3d 485, 488 (7th Cir.1993); *United States v. Gould,* 983 F.2d 92, 94 (7th Cir.1993). Interpretation of the term "position of trust" is a legal question, subject to de novo review. *Boyle,* 10 F.3d at 489. Whether a defendant occupied a posi-

tion of trust is a question of fact that this court reviews for clear error. *Id.*

■ In determining whether the defendant's position was a position of trust, we must analyze the situation from the perspective of the victim. *United States v. Hill,* 915 F.2d 502, 506 n. 3 (9th Cir.1990).[3] If Ms. Hathcoat *abused* a position of trust, it must have been a position bestowed upon her by the Bank, the victim of her malfeasance. More specifically, if the Bank placed her in a position of trust "characterized by professional or managerial discretion" which facilitated the execution and detection of the crime, then it is appropriate to enhance the sentence.

■ Ms. Hathcoat submits that the district court committed error when it determined that the crime was facilitated by a position of trust in which she had been placed by the Bank. In her view, the record demonstrates that, from the perspective of the Bank, she had no more freedom of action and no more authority than any other bank teller. Upon examination of the record, we find that the testimony submitted by the government and by the defense presents an ambiguous picture as to the source of the lack of supervision and the consequent freedom that permitted Ms. Hathcoat to perpetrate the embezzlement in question. Indeed, on the present state of the record, there is a great deal of evidence that her freedom of supervision came not from the Bank but from the malfeasance of her manager who was her confederate in this scheme. The testimony shows that, after Ms. Hathcoat initiated the embezzlement on her own, her illegal actions were detected by her manager. Had the manager not breached her own duty to the bank, the embezzlement would have ended at that point. If Ms. Hathcoat was subjected to the same scrutiny as all other ordinary tellers but simply had, from her perspective, the good fortune to have a supervisor who was as dishonest as she, it would be difficult to conclude that her freedom of action had been bestowed upon her by the bank. *Cf. Crad-*

3. We note that this case, as presented by the government, does not involve a breach of a public trust as was the case in *United States v. Shyllon,* 10 F.3d 1, 5 (D.C.Cir.1993) (applying the 1992 version of the guidelines to charges of extortion and mail fraud), *cert. denied,* — U.S. ——, 114 S.Ct. 1327, 127 L.Ed.2d 675 (1994).

*dock,* 993 F.2d at 343 ("When a teller handles cash under the watchful eye of a supervisor and is subject to a daily audit, there is no trust aspect to the authority he or she exercises; in this situation, the bank is not relying on the teller's personal integrity to avoid the loss occasioned by skimming from the till.").

Resolution of this significant ambiguity in the record is, of course, the prerogative of the district court which enjoys a far better vantage point than we to determine this fact-bound issue. We therefore have studied carefully the findings of the district court. Although the court focused on whether Ms. Hathcoat enjoyed more freedom than normally attributed to someone holding the position of teller, we cannot determine whether the court was of the view that this freedom was attributable to the actions of the victim Bank or to the actions of her confederate-manager. Although the beginning of the district court's oral discourse seems to focus on the actions of the Bank, the later parts clearly emphasize that the embezzlement was facilitated because of the cooperation of the manager.

Under these circumstances, it is necessary for us to vacate the sentence and to remand the case to the district court. Upon resentencing, the district court must make the explicit findings contemplated by this opinion and impose the correct sentence. *See United States v. Barnes,* 948 F.2d 325, 330–31 (7th Cir.1991) (detailing the obligations of the district court upon resentencing). Because of the relatively short length of the sentence imposed, we respectfully suggest that this matter be heard by the court as soon as practicable.

Accordingly, the sentence is vacated and the case is remanded for proceedings consistent with this opinion.

SENTENCE VACATED AND CASE REMANDED.

ESCHBACH, Circuit Judge, dissenting.

For the most part, I agree with the majority's well-reasoned analysis of the state of the law concerning the Sentencing Guidelines' increase for abusing a "position of trust" under § 3B1.3. However, I disagree with the majority's apparent conclusion that § 3B1.3 requires us to determine who bestowed a position of trust on the defendant, or that we need to determine the "source of the lack of supervision" over the defendant. I also believe the majority's opinion is at odds with our prior opinion in *United States v. Lamb,* 6 F.3d 415, 420 (7th Cir.1993). Yet even if I agreed with the majority's interpretation of § 3B1.3, I nonetheless believe the facts in this case are sufficiently clear that the defendant violated the Bank's trust that a remand is superfluous.

The majority's analysis releases § 3B1.3 from its moorings. The purpose of § 3B1.3 is to punish more severely those defendants whose crimes are more difficult to detect by virtue of the special nature of their positions. I, like the Court of Appeals for the District of Columbia, fail to see anything in the language of § 3B1.3 or its Commentary that requires that the *victim* in particular bestow the defendant with the specific duties that create a position of trust. *See United States v. Shyllon,* 10 F.3d 1, 5 (D.C.Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1327, 127 L.Ed.2d 675 (1994). The language of § 3B1.3 requires simply that the defendant have occupied a position of trust which made it easier to commit a hard-to-detect crime, regardless of *who* bestowed the position of trust on the defendant. Whether the victim himself bestowed the defendant with a position of trust is merely coincidental to the determination of whether the defendant *in fact* occupied a position of trust which enabled him to escape detection.

The rest of the footnote in *United States v. Hill,* 915 F.2d 502, 506 n. 3 (9th Cir.1990), cited by the majority, *see* Op. at 919, makes this clear: "a trust relationship may exist among other parties as well[,] such as between a customer and an employee." For example, in the case of bank employee embezzlement, there could be multiple victims of an employee's breach of trust, including the bank, its shareholders, its customers, and even federal insurers. However, not each of these victims *explicitly* bestows a position of trust upon or "fails to supervise" the bank employee—a finding the majority would apparently require before applying § 3B1.3. A

bank customer may trust the bank and therefore also indirectly trust its employees, but it would be awkward to say the customer *bestowed* the bank employee with his position of trust or that the customer "failed to supervise" the bank employee, even though the customer might still be a victim of the employee's embezzlement. In sum, the language of § 3B1.3 fails to support the majority's reading of § 3B1.3. As a result, I disagree that we need to venture beyond deference to the district court's finding that the defendant in fact occupied a position of trust that enabled her to commit crimes otherwise more easily detectable.

Notwithstanding my disagreement with the majority's analysis of § 3B1.3, I have a more fundamental problem with our holding today. In *Lamb*, 6 F.3d at 420, we analyzed the problem of the "ordinary bank teller."[1] Quoting *United States v. Odoms*, 801 F.Supp. 59, 64 (N.D.Ill.1992), we stated: "'Ordinary bank tellers can and do embezzle funds, evading detection commensurate with their creativity, their computer skills and the bank's detection sophistication and effort.'" We went on to say: "Thus we are of the opinion that *bank tellers are in a position of trust* and any attempt to provide a standard for district courts to distinguish bank tellers from other lower echelon employees would result in far too much confusion." *Lamb*, 6 F.3d at 420 (emphasis supplied). Today's holding flatly contradicts our analysis and holding in *Lamb*. In *Lamb* we recognized that bank tellers, equipped with specialized information and knowledge, occupy a position of trust which would make embezzlement more difficult to detect. That is precisely what happened in this defendant's case. Kathy Hathcoat used her specialized knowledge of internal bank auditing procedures to devise an elaborate scheme of embezzlement designed to avoid detection. I see no reason to stray from *Lamb*.

Regardless of my disagreement with the majority regarding the correct application of § 3B1.3, I also believe further factual findings are unnecessary. The record shows that Hathcoat exercised responsibilities identical in substance to those of her supervisor, Cooper. As the district court concluded, Hathcoat and Cooper were essentially "alter egos" of one another, acting "without regard to the differences [between] their position[s]." Like Cooper, Hathcoat interacted with the Bank by filing false reports regarding the branch's cash levels. Hathcoat also knew internal bank auditing procedures necessary to facilitate her fraud. Looking to the substance of Hathcoat's duties, as the majority agrees is the proper approach, *see* Op. at 918, Hathcoat occupied essentially the same position of trust as her supervisor Cooper. Hathcoat relied on her specialized knowledge of bank procedures and the trust of the Bank to facilitate and conceal her criminal endeavors.

Moreover, it is apparent that the Bank itself was responsible for "failing to supervise" Cooper and Hathcoat. The district court concluded: "The fact that there were only two [employees at the branch] laid the basis for Ms. Cooper's imparting all of this information about how the bank runs and basically made Ms. Hathcoat into a different sort of employee at the bank and gave her the opportunity by virtue of that position to commit this crime and to conceal the offense." Thus, because the Bank assigned only two employees to the Pendleton branch, it was necessary, indeed probably proper, for Cooper to instruct Hathcoat on her additional responsibilities. Therefore, under the majority's analysis, the *Bank* was responsible for the "failure to supervise" Hathcoat. As a result, I see no need to remand for further fact finding.

---

1. For a discussion of the tension between § 3B1.3 and the Commentary's reference to the "ordinary bank teller," and our rejection of the bank teller example, *see Lamb*, 6 F.3d at 418–21.