74 F.3d 1242
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Caralea LINK and Jan Cargill, Defendants-Appellants.
 Nos. 95-2860, 95-2861.
 United States Court of Appeals, Seventh Circuit.
 Argued Dec. 13, 1995.
Decided Jan. 17, 1996.
 
 Before ESCHBACH, COFFEY and EVANS, Circuit Judges.
 
 ORDER
 
 1
 Caralea Link and Jan Cargill both worked as tellers and bookkeepers at Midwest Bank of Oquawka ("MBO"). They pleaded guilty along with two other MBO employees, Marilyn McKee and Julie Hunter, to embezzlement by a bank employee, 18 U.S.C. Sec. 656. At their sentencing, the district court enhanced Link and Cargill's sentences pursuant to U.S.S.G. Sec. 3B1.3 for "abuse of a position of trust." Link and Cargill appealed only their sentence enhancements under Sec. 3B1.3. Because we conclude that the district court was not clearly erroneous in determining that Link and Cargill abused positions of trust, we affirm.
 
 Facts
 
 2
 While employed by MBO, the four defendants in this case perpetrated a fairly elaborate check kiting scheme that began as early as 1984. Check kiting takes advantage of the delay between the time a deposit is posted to an account and the time the payor's bank actually deducts funds from the payor's account. This delay is known as the "float." Typically,
 
 
 3
 [c]heck kiting involves the knowing drafting and depositing of a series of overdraft checks between two or more federally insured banks with the purpose of artificially inflating bank balances so that checks can be drawn on accounts that actually have negative funds. If timed correctly, the bank will be prevented from discovering that the accounts are overdrawn and will be tricked into honoring checks drawn on accounts with insufficient funds. By repeating this scheme over a period of time a person in essence may obtain an interest-free loan.
 
 
 4
 United States v. LeDonne, 21 F.3d 1418, 1425 n. 2 (7th Cir.1994), cert. denied, 115 S.Ct. 584 (1994) (citations omitted).
 
 
 5
 One need not be a bank employee to kite checks. In this case, however, the four defendants kited checks by routing them through the Federal Reserve Bank ("Fed"). Normally, if a check is drawn on the same bank as that in which the payee deposits the check, the bank can simply transfer funds from the payor's account to the payee's. If the check is drawn on a different bank than the depositor's, however, the depositor's bank must clear the check through the Fed. The list of checks sent to the Fed is called the "cash letter." Some small banks do not have accounts at the Fed. If not, the bank will have a "correspondent account" with another bank that does have account at the Fed. In this case, MBO had a correspondent account with Norwest Bank. MBO sent its cash letter to Norwest, which then sent the checks on to the Fed for clearing.
 
 
 6
 The defendants created a kite by writing checks to cash drawn on their own accounts, although they had insufficient funds to back the checks. They then posted the cash as deposits in their own accounts and sent the checks out in the cash letter. In this way, the checks would not immediately be posted against their accounts. (It takes several days to route checks through the Fed.) To balance the bank's accounts, they took checks which had already cleared on MBO (that is, transfers from MBO to another bank) and sent them back through the correspondent account a second time. This created a debit on MBO's books to match the cash they had taken. When these checks came back, they could not be deducted from the check writer's account a second time. Instead, the amount of the checks was the amount of the kite the defendants had to generate for the outgoing cash letter the next day. Each day, they had to account for the previous day's imbalance. Thus, once begun, the defendants had to keep the kite aloft.
 
 
 7
 The four defendants originally had individual kites. When these kite became too large to handle, the defendants combined their separate schemes and deducted money from MBO customers' accounts to cover the total. The defendants would put the money back into the customers' accounts immediately before their monthly statements went out, retype the statement to hide the deduction and replacement, and then deduct the money from the accounts again to make up the shortfall.
 
 
 8
 Ultimately, the strain of continuing the scheme and the risk that a pending bank merger might uncover their actions became too much for the defendants. They contacted a lawyer and turned themselves in to the FBI in May, 1994. They aided the FBI and the FDIC in their investigations of Linda Dooley, the head cashier, and James Blake, the executive vice-president at MBO. Although Dooley and Blake were supposed to supervise the tellers and bookkeepers at MBO, they failed to do so in any meaningful way. Dooley and Blake were fired, but never criminally prosecuted.
 
 
 9
 All four defendants pleaded guilty. At their sentencing, Cargill and Link each received a base offense level of 4, a 12 point enhancement for the amount of the embezzlement, a 2 point enhancement for more than minimal planning, and a 2 point enhancement under Sec. 3B1.3 for abuse of a position of trust. With a three point deduction for acceptance of responsibility, the appellants each had a total offense level of 17. Cargill and Link had a criminal history categories of I, and received a sentences of 24 months in prison.
 
 
 10
 On appeal, Cargill and Link argued only that the district court erred by concluding that they occupied positions of trust within the meaning of Sec. 3B1.3.
 
 Analysis
 
 11
 Whether a defendant occupied a position of trust is a factual question that this court reviews for clear error. United States v. Hathcoat, 30 F.3d 913, 919 (7th Cir.1995). Section 3B1.3 describes a position of trust as one:
 
 
 12
 characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this enhancement to apply, the position of trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult).... This adjustment would not apply in the case of embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.
 
 
 13
 U.S.S.G. Sec. 3B1.3 comment. (n. 1).
 
 
 14
 Both parties make much of the "ordinary bank teller" example. The defendants argue that they were merely "ordinary bank tellers"; the prosecutor insists that the defendants were "tellers and bookkeepers." We believe it important, however, to look past simply the defendant's job title to ascertain whether he held a position of trust; instead, "the sentencing court must look ... to the actual nature of the relationship and the responsibility the defendant is given." United States v. Boyle, 10 F.3d 485, 489 (7th Cir.1993).
 
 
 15
 Here, the record is clear that the appellants held considerable responsibility and authority within MBO: they had the responsibility for preparing the outgoing cash letter each day; they reconciled the bank's books with the incoming cash letter; and they had access to customers' accounts--enough so they could intercept customers' monthly statements and re-type them to hide the fact that they deducted and replaced funds from customers' accounts. The appellants used this authority and access they possessed by virtue of their positions to conceal their check kite.
 
 
 16
 Moreover, the nature of the appellants' relationship with MBO supports the conclusion that the appellants held positions of trust. MBO did not supervise the appellants in any meaningful way. By not verifying the appellants' bookkeeping entries, MBO gave "considerable deference" to the appellants' work. The appellants knew that MBO did not monitor their work, and so they were free to carry out their check kiting scheme for a decade. The nature of the relationship between the appellants and MBO was one of trust and the appellants used that trust to facilitate and conceal their embezzlement.
 
 
 17
 There is no question that the appellants here used the authority, access, and autonomy of their positions to carry out and conceal their check kiting scheme. The purpose of Sec. 3B1.3 is "to punish more severely those defendants whose crimes are more difficult to detect by virtue of the special nature of their positions." Hathcoat, 30 F.3d at 920 (Eschbach, J., dissenting). On the record before us, then, we cannot say that the district court clearly erred by enhancing the appellants' sentences under Sec. 3B1.3.
 
 
 18
 AFFIRMED.