UNITED STATES of America,
Plaintiff–Appellee,

v.

Grama K. BHAGAVAN, Defendant–
Appellant.

No. 95–3382.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 20, 1996.

Decided May 22, 1997.

Andrew B. Baker, Jr. (argued), Office of the United States Attorney, Dyer, IN, for Plaintiff–Appellee.

James B. Meyer (argued), Scott L. King, King & Meyer, Gary, IN, for Defendant–Appellant.

Before POSNER, Chief Judge, and CUDAHY and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

In his position as president and largest shareholder of Valley Engineering, Inc., a small engineering and surveying firm, Grama Bhagavan was able to control the firm's day-to-day operations. And control them he did, to a fault: this case arose because Bhagavan diverted a substantial amount of money nominally due to Valley into his personal bank accounts. Worse yet, he did not report these monies as income on either Valley's corporate returns or his personal return. When the IRS caught up with him, Bhagavan eventually pleaded guilty to one count of personal income tax evasion for the tax year 1988 in violation of 26 U.S.C. § 7201. Bhagavan now claims that the district court made several errors in computing his Sentencing Guideline range. Because we conclude that the district court's interpretations of the Guidelines were correct and that its findings of fact were adequately supported by the evidence, we affirm the sentence.

## I

Although Valley was a small company, Bhagavan was not its only shareholder. In addition to Bhagavan, who owned 60% of its shares, the shareholders included Bhagavan's wife, Sita, draftsman Ronald Golden, survey manager Noah Stump, and two others. Golden and Stump each owned 20 shares of stock in Valley which they each purchased in 1986 for $500 a share. Although Valley appears not to have paid dividends regularly, the record shows that in 1987, Golden and Stump each received a dividend of $200. Evidently they never received any other dividends thereafter, and the company bought out their stock in 1993. Unbeknownst to the other shareholders, Bhagavan paid himself secret stock dividends of $500 in both 1988 and 1989, and he gave Sita Bhagavan a secret $250 stock dividend in 1989. In addition, Bhagavan received director's fees of $200 in both 1987 and 1988 and of $400 in 1989, while Sita Bhagavan received director's fees of $650 in 1988 and $200 in 1989. In 1993, Valley itself was acquired by Abonmarche Consultants.

In addition to his positions as president and largest shareholder, Bhagavan was also Valley's chief operating officer. Among other things, he solicited accounts from customers, handled payment terms, and directed where payments should go. Bhagavan opened the mail personally and passed along client checks to Valley's office manager, Sharon Campbell, for deposit. Campbell followed Bhagavan's instructions on other matters as well: she made out customer invoices according to notes he left her, and she recorded those invoices and the corresponding payments on a chart she kept for each client. Valley used an outside accountant to prepare its tax returns, which were based entirely on its bank accounts without reference to its invoices or account ledgers.

This system enabled Bhagavan to manipulate which incoming business went Valley's way, and which business remained "personal" to him. From 1987 to 1991, he arranged for 19 companies to make their checks payable to him personally and deposited those checks (amounting to $98,830) in his personal bank account without reporting them as income.

A total of $95,355 of the diverted income came from known Valley clients, while the remaining $3,475 came from payors who were not listed as clients in Valley's books. For the former group, Bhagavan's practice was to request the client to pay for invoices partly with checks made out to Valley and partly with checks made out in his own name. Often, Bhagavan would record "credits" or "professional discounts" in the firm's accounting books which matched the amounts of the checks made out to him personally; he then reduced Valley's accounts receivables by these amounts. For the $3,475 coming from companies that could not be identified as Valley clients, Bhagavan billed the payors on his personal letterhead. Although he reported $2,975 in imputed dividends in 1987 and 1990, Bhagavan did not file Form 1099's in any of these years, which would have been required if he had personally done $600 or more of work for a business client in a given tax year.

## II

A grand jury initially indicted Bhagavan on seven counts of tax evasion, four relating to his individual income taxes for the years 1987–90 and three relating to false corporate tax returns for the years 1988–90. Ultimately, he entered a plea of guilty on one count of attempted individual tax evasion for the tax year 1988 and the remaining counts were dismissed. The Probation Department, using the 1988 version of the Sentencing Guidelines (because of *ex post facto* concerns related to changes in the tax guideline), prepared a Presentence Report (PSR), which recommended that the $95,355 coming from Valley's clients should be treated as corporate income, subject to both the double taxation treatment of imputed dividends and the higher corporate rate. That figure resulted in a total tax loss of $50,182, which in turn yielded a base offense level of 11 under the tax table at USSG § 2T4.1(g). The PSR also recommended a two-level enhancement under USSG § 3B1.3 for abuse of a position of trust, a two-level enhancement under USSG § 2T1.1(b)(2) for use of sophisticated means, and a two-level decrease under USSG § 3E1.1 for acceptance of responsibility, for a final level of 13.

At the sentencing hearing, Bhagavan argued that the unreported $95,355 represented personal income for services he performed as a private consultant, not corporate income. Both he and the government presented witnesses who testified about the internal operations and the corporate structure of Valley. The district court agreed with the government that the clients whose checks Bhagavan pocketed believed they were dealing with Valley and not with Bhagavan personally and therefore concluded that the $95,355 was properly characterized as corporate income. The district court rejected the proposed enhancement for the use of sophisticated means, but it agreed that Bhagavan had abused a position of private trust for purposes of § 3B1.3. As president of the company, Bhagavan had abused the trust of the other shareholders by diverting funds that could have been used to pay dividends or to improve the company's long-term prospects. Finally, the district court gave Bhagavan a two-level decrease under § 3E1.1 for acceptance of responsibility, which brought his final adjusted offense level back down to 11. With his Criminal History Category of I, this meant that the final sentencing range was 8 to 11 months. The district court sentenced Bhagavan to four months of imprisonment and four months of community confinement to be followed by a three year term of supervised release and fined him $3,000.

## III

Bhagavan has three complaints about his sentence: he argues that the unreported $95,355 should have been classified as individual income, that the district court misinterpreted the guideline for abuse of private trust in his situation, and that the evidence did not support the district court's finding that an enhancement for an abuse of a position of trust was appropriate. We review the proper tax treatment of a transaction *de novo* and underlying facts for clear error. See *Indianapolis Power & Light Co. v. Commissioner,* 857 F.2d 1162, 1165 (7th. Cir. 1988), aff'd, 493 U.S. 203, 110 S.Ct. 589, 107 L.Ed.2d 591 (1990); see also *United States v. Brimberry,* 961 F.2d 1286, 1291 (7th Cir.

1992) (ultimate issue of amount of tax loss is issue of law). We review *de novo* the district court's interpretation of the meaning of "position of trust," see *United States v. Strang,* 80 F.3d 1214, 1219 (7th Cir.1996); *United States v. Sinclair,* 74 F.3d 753, 762 (7th Cir.1996), but we review the finding that Bhagavan occupied such a position under the clearly erroneous standard, see *United States v. Stewart,* 33 F.3d 764, 768 (7th Cir. 1994).

### A. Calculation of the Tax Loss

■ The base offense level of USSG § 2T1.1(a) is determined by the "tax loss." The 1988 Sentencing Guidelines defined "tax loss" as the greater of (A) the total amount of tax that the defendant evaded or attempted to evade, including interest; and (B) the "tax loss" as defined in USSG § 2T1.3. Section 2T1.3 defined "tax loss" as "28 percent of the amount by which the greater of gross income and taxable income was understated, plus 100 percent of the total amount of any false credits claimed against the tax. If the taxpayer is a corporation, use 34 percent in lieu of 28 percent." The question whether the $95,355 in controversy here was properly characterized as corporate income rather than individual income is one of fact, and we see nothing erroneous in the district court's conclusion that this income was Valley's rather than Bhagavan's personal income. The clients received their bills on Valley invoices, they received offsetting credits or discounts in the precise amounts that Bhagavan instructed them to send to him, they never filed Form 1099's for the money paid to Bhagavan, and the type of work he performed was consistent with Valley's business. It is not as if Bhagavan were receiving payments for oil paintings he produced in his spare time, which he marketed separately. Indeed, there is even an interesting question under Indiana corporate law whether Bhagavan could appropriate corporate opportunities of this type for himself, consistently with his duties to the company and its minority shareholders. But there is no need to belabor the point; the money was corporate, and we must therefore decide whether the district court handled the tax loss question properly as a matter of law.

■ In *United States v. Harvey,* 996 F.2d 919 (7th Cir.1993), this court set forth the proper methodology for determining tax loss for purposes of USSG § 2T1.3(a) (which was consolidated with § 2T1.1 effective November 1, 1993) in cases like this one, where a single crime causes both corporate and personal income to be understated. The district court followed the *Harvey* methodology carefully, and again, we find no error in its conclusion. Under *Harvey,* the calculation involves three steps, which begin from the premise that the full amount of the loss was an imputed dividend to the individual taxpayer: (1) apply the corporate rate of 34% to the unreported profit, which produces the amount of lost corporate taxes, (2) reduce the imputed dividend by the amount of the imputed corporate taxes; and (3) apply the personal rate of 28% to the reduced dividend to determine the amount of lost personal taxes. Here, we take 34% of $95,355, which is $32,420.70, the lost corporate taxes. We next subtract $32,420.70 from $95,355, which gives $62,934.30 as the adjusted imputed dividend. At this stage, we must add the additional $3,475 to the imputed dividend, because this is the income Bhagavan received that did not go through Valley, and we subtract the $2,975 that he actually reported. This produces a total of $63,434.30 in unreported income. Finally, we take 28% of the $63,434.30, which is $17,721.60, the amount of lost individual taxes. The sum of the two types of lost taxes, $32,420.70 + $17,721.60, is $50,182.30. We repeat these calculations for the benefit of those who have not seen the district court's opinion, which clearly and accurately followed the same analysis. Under the 1988 version of USSG § 2T1.1(a), this corresponded to a base offense level of 11.

### B. Abuse of a Position of Trust

■ Bhagavan's efforts to show error in the district court's decision to enhance his level for abuse of a position of trust are equally unavailing. Application Note 1 to § 3B1.3 defines "public or private trust" as a position "characterized by professional or managerial discretion (*i.e.* substantial discre-

tionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." In order for the enhancement to apply, the defendant must have used his position of trust in such a way that made the offense easier to commit or conceal. See *id.* The Application Note gives the examples of an attorney serving as a guardian who embezzles funds from a client and a bank executive's fraudulent loan scheme. In determining whether an enhancement for an abuse of a position of trust is appropriate, we look "to the nature of a defendant's relationship to the victims and to the responsibility he was given." *Strang,* 80 F.3d at 1220 (enhancement appropriate where defendants befriended victims in order to persuade them to invest in phony scheme); see also *Sinclair,* 74 F.3d at 763 (enhancement appropriate where assistant vice president of bank proposed to split commissions from bank loan insurance policies with insurance broker).

Bhagavan's legal challenge to this enhancement focuses on the nature of the victim of his scheme. He argues, relying on *United States v. Hathcoat,* 30 F.3d 913 (7th Cir. 1994), and *United States v. Broderson,* 67 F.3d 452 (2d Cir.1995), that this enhancement may be used only when "the" victim has placed the defendant in the position of trust. He argues that the victim here was the Government, which did no such thing. He also suggests that the minority shareholders could not have placed him in a position of trust, because he had full power to run the company without them. The fallacy in these arguments is the notion that there can be only one victim of a tax evasion scheme—the United States-and thus that the § 3B1.3 enhancement can never apply in tax evasion cases. In *Stewart* we recognized that the same fraudulent scheme might inflict harm on multiple sets of victims—there, both elderly individuals who were trying to arrange in advance for their funerals, and the funeral companies who agreed to provide the services. See 33 F.3d at 769. Under hornbook corporate law, Bhagavan's position as majority shareholder and president brought with it fiduciary duties to act in the interests of the

minority shareholders. Thus, in that sense he did occupy a position of trust *vis a vis* the minority, which was a price of his use of the corporate form of doing business. The other shareholders were victims of his scheme to enrich himself and to avoid paying taxes on the secret income: to the extent that the income was diverted from the corporation to Bhagavan's own pocket, it was unavailable for any other lawful corporate purpose. It is enough that identifiable victims of Bhagavan's overall scheme to evade his taxes put him in a position of trust and that his position "contributed in some significant way to facilitating the commission or concealment of the offense." Application Note 1, § 3B1.3. The district court correctly concluded that this enhancement was available as a legal matter.

*Hathcoat* and *Broderson* are distinguishable on other grounds as well. Application Note 1 to USSG § 3B1.3 draws a clear distinction between one who has "professional or managerial discretion (*i.e.* substantial discretionary judgment that is ordinarily given considerable deference)" and those subject to significant supervision, such as "an ordinary bank teller or hotel clerk." The defendant in *Hathcoat* was a bank teller, but her ability to embezzle might have been made possible primarily by her cooperation with her corrupt manager; a remand was therefore necessary to determine whether the enhancement was proper. See 30 F.3d at 919. In *Broderson,* the Second Circuit reversed an enhancement under this section partly because the underlying offense itself consisted of abuse of a position of trust (in that case, violations of the Truth in Negotiations Act, 10 U.S.C. § 2306a, and the Federal Acquisition Regulations, 48 C.F.R. §§ 15.801–15.804), as opposed to an offense, such as skimming, that is facilitated by holding a position of trust. See 67 F.3d at 456. The Guidelines expressly disallow the abuse-of-trust enhancement where the abuse is a necessary element of the offense. See USSG § 3B1.3; *Sinclair,* 74 F.3d at 762. Here, the district court found that Bhagavan had both extensive managerial control and discretionary executive powers, and the abuse was not a necessary element of the offense.

## C. Sufficiency of the Evidence of an Abuse of a Position of Trust

■ We have little to say on Bhagavan's last point, which is that the district court clearly erred in concluding that his actions actually amounted to an abuse of a position of trust. First, we review this kind of determination deferentially. Second, the evidence amply showed that his actions "significantly facilitated the commission or concealment of the offense." See *Strang*, 80 F.3d at 1219–20; *Hathcoat*, 30 F.3d at 919; *United States v. Lamb*, 6 F.3d 415, 421 (7th Cir.1993). He personally opened the mail, decided how each customer should pay its invoices, restricted the information available to his own office manager and accountant, and adjusted invoices to reflect his side payments. These actions both facilitated the commission of the tax evasion offense and concealed it from others with a connection to the company, making the enhancement appropriate.

The judgment of the district court is AFFIRMED.

CUDAHY, Circuit Judge, concurring in part and dissenting in part.

I concur in all aspects of the able majority opinion but one: its treatment of the sentence enhancement for abuse of trust under U.S.S.G. § 3B1.3.

The question here is whether Bhagavan abused a position of trust reposed in him by a victim *of the crime for which he was convicted*—tax evasion. The majority points to his abusing his fiduciary relationship to Valley Engineering's minority stockholders. By receiving payments for engineering services personally instead of allowing them to be submitted to the corporation, Bhagavan may have violated a duty to the minority stockholders. Bhagavan says that the minority stockholders may not have been deprived of anything tangible since Bhagavan as majority stockholder had the power to pay himself large sums as salary; this may very well be so, since the minority stockholders in the years in question received only $200 in dividends. I concede, however, that in principle if not in concrete reality, the minority stockholders reposed a trust in Bhagavan and that the minority has suffered from the diversion of revenue.

But this concession does not answer the relevant question. For, although the minority stockholders may be victims of the diversion of revenue, they are not victims of the crime of conviction—tax evasion—or any other crime, for that matter. Thus, there is no nexus between the putative victims, the minority stockholders, and the crime of conviction, tax evasion. No nexus, no enhancement: this is the law of this circuit, and of others as well. *See, e.g., United States v. Hathcoat*, 30 F.3d 913, 919 (7th Cir.1994); *United States v. Broderson*, 67 F.3d 452, 456 (2d Cir.1995). The majority cites examples from the Guidelines' Application Note that confirm this rule: an attorney's embezzling from his client and a bank executive's approving fraudulent loans. In both examples a nexus links victim and crime: the client was the victim of the embezzlement, the bank the victim of the fraudulent loans. I agree that beyond a doubt a crime may have more than one victim, but all the alleged victims must suffer from the one crime—not from some other circumstances.

The majority speaks of Bhagavan's "scheme": diverting the revenue from Valley Engineering and then not paying the taxes due. Bhagavan, however, stands convicted only of tax evasion. The diversion of revenue is not even a crime, as far as I can tell. And even if the diversion were relevant, there is nothing to show that Bhagavan diverted the revenue for the *purpose* of avoiding taxes. All we know is that the revenue was diverted and the taxes not paid. This is roughly analogous to a person's embezzling from her employer and not paying taxes on the loot. She steals, but we do not ordinarily assume that she steals for the purpose of evading taxes. (There the employer would be a victim—but of the crime of theft, not of her tax evasion.)

Although the minority shareholders may have been victims of the diversion, they were certainly not victims of the tax evasion. If anything, Bhagavan's failure to pay the corporate taxes benefitted, not burdened, the minority shareholders. The problem with the majority's multiple-victim theory here is that the IRS and the minority shareholders

were not victims of the same crime. In fact, the minority shareholders were not victims of any crime. They merely may have suffered a breach of fiduciary trust—at most, a civil wrong.

I therefore respectfully dissent with respect to the enhancement.