UNITED STATES of America,
Plaintiff–Appellee,

v.

Steven R. NEWMAN, a/k/a Richard New-
man, a/k/a Richard Genovese, a/k/a
John Rome, Defendant–Appellant.

No. 90–3645.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 7, 1992.

Decided May 26, 1992.

Rehearing and Rehearing En Banc
Denied June 19, 1992.

Thomas E. Karmgard, Asst. U.S. Atty., Danville, Ill., Rodger A. Heaton, Asst. U.S. Atty. (argued), Office of the U.S. Atty., Springfield, Ill., for U.S.

Curtis L. Blood, Collinsville, Ill. (argued), for defendant-appellant.

Before POSNER and EASTERBROOK, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

POSNER, Circuit Judge.

Steven Newman, a 37–year–old graduate of Ohio State University, pleaded guilty to two counts of fraud and was sentenced to ten years in prison. This was less than the statutory maximum of fifteen years, but it was a departure from the applicable guidelines range (24 to 30 months)—a departure that Newman describes as "spectacular" and asks us to disallow. (He also objects to one of the adjustments made to get to the 24 to 30 month range in the first place.) Newman was also ordered to make restitution of $46,500 to the victims of the fraud, but he makes no objection to this part of the sentence.

The series of upward departures from the guideline range that cumulatively increased Newman's prison sentence to ten years was based on information contained in a meticulous presentence report of 34 single-spaced pages, the government's and Newman's written objections to the report, and a hearing before the district judge at which a psychologist who was treating Newman's principal victim testified and the parties repeated their objections to the presentence report orally. Not to be overlooked is the photograph appended to Newman's written objections, which shows him and the victim, or rather principal victim, of his fraud, Diana Scharff, in the company of three dogs. Above the photo Newman had typed the following legend: "The Very Happy Couple. Living on Love. No Drugs and No Brainwashing."

The legend is a clue to the unusual character of this fraud case. The presentence report narrates a tale of deceit, sexual abuse, and virtual enslavement that unfolded over an eight-month period in 1988 and 1989. It began when Newman, falsely representing to a modeling agency that he was seeking models for employment in his advertising agency (which did not exist), obtained the name of Diana Scharff, a 20–year–old would-be model who was working at a fitness center in California. He met with her in California and shortly afterward persuaded her to fly to Reno to discuss a modeling contract with him. She swallowed the bait, and when she arrived he told her he would give her a modeling contract worth $100,000 to her. (Of course she never received a cent.) He told her to quit her job at the fitness center, and she did. They began to travel around the country together in ostensible quest of modeling assignments. He kept telling her that he had arranged for large sums of money to be deposited in her bank accounts in California and in Illinois (where her parents lived). Believing him, she wrote a number of checks on these accounts at Newman's direction to pay their travel and living expenses, and when these checks began to bounce—Newman having deposited no money in the accounts—he asked her parents to make good the overdrafts, promis-

ing to reimburse them. The parents did so and he reimbursed them, but with checks that bounced.

Diana Scharff had problems of some sort with her colon. Newman took control of her diet and medication. He administered massive doses of drugs, which made her sick. He used threats to compel her to have sexual intercourse with him, telling her that his real name was Genovese, that he was in the Mafia, that he would have her followed wherever she went, and that he would harm her and her family if she tried to leave him or peach on him. As a result, though she visited her parents without him on several occasions, she never told them what he had done to her. He told her that she was stuck with him because they were married, his brother (he told her) having bribed a judge in Nevada to issue a marriage license for them. He told her that he was possessed by a demon named "Derrick" who could read her mind—so she should forget about trying to escape. But to be on the safe side he confined her to their hotel room for weeks on end. He tied her down with belts and raped her. She became pregnant three times; the pregnancies were terminated by miscarriage or abortion.

He told her parents that Diana and he were married, that she had cancer, that she was suicidal. He ordered a Mercedes for the Scharffs, telling the dealer that the money for the car would be wired to him; it was not. He and Diana spent a lot of time with her parents and he persuaded them to install both a satellite system and a security system in their home, and he paid for these items with a check—that bounced. The Scharffs became impatient. Newman told them that his mother in New Jersey had the money to repay them. They rented a car and drove with him to New Jersey. He went into a house and came out with a bundle that he said contained $50,000. When they got back to Illinois and Mrs. Scharff opened it, she found that it contained folded newspapers rather than money. At this point Newman owed the Scharffs a total of $46,500. He gave them a check for this amount. It bounced. Mr. Scharff became desperate. He decided to kill Newman. He made an appointment with him at the Scharff home and waited there with a gun, intending to kill him when he arrived—but true to form Newman didn't show up.

During the spree Newman defrauded limousine services, hotels, and other providers of services. And when Diana Scharff told him that she had been raped at the age of 15 by a family friend, he tried to blackmail the alleged rapist. Newman also defrauded Diana's sister and brother-in-law of several thousand dollars.

Newman denied all nonfinancial aspects of the tale told in the presentence report. He denied the rapes, the confinement, the plying with drugs, the threats, pointing for support to the photo with the three dogs, to a polygraph report, and to a letter that Diana wrote Newman's mother after the break-up, professing continued love for him and making no reference to any sexual abuse. Diana, he contended, "is a young lady trying to be a virgin princess for her daddy, and after her abortions were discovered she can only remain Daddy's princess by lying and saying I was the cause of her 'problems.'" He asked rhetorically, how could the charges of sexual abuse be true, when Diana could have broken with him when she visited her parents without him? Why, he couldn't even drive. He did not deny the fraud. Far from it. He said at the sentencing hearing "I would be a fool to try to convince you and anyone else that I haven't been a con man most of my life." The information gathered in the presentence investigation corroborates this confession. Although Newman has only one previous conviction (a Canadian conviction for fraud), the presentence investigation revealed that he had used the modeling-career ploy on a number of other women, defrauding them and attempting (though unsuccessfully) to obtain sexual favors through threats and lies similar to those he used with greater success on Diana Scharff. His employment history is, at best, spotty, lending further credence to his statement that he's been a con man most of his life.

After finally breaking with Newman, Diana Scharff underwent therapy with a psychologist to whom she told the whole story, which the psychologist repeated at the sentencing hearing. The psychologist diagnosed Scharff as suffering from post-traumatic stress and sexual abuse. Her symptoms included nightmares, crying jags, memory blocks, anxiety, depression, exhaustion, and drug withdrawal. The psychologist believed that Newman had given Diana Scharff barbiturates, amphetamines, codeine, valium, and possibly other drugs as well, and that the combination had apparently caused some "organ failure" because Diana's legs had turned black at one time and black spots would reappear from time to time on her legs. The psychologist thought Diana might have been particularly susceptible to Newman's scheme because of the sexual assault on her when she was 15.

The government did not call Diana Scharff herself as a witness. The psychologist had told her not to testify because the experience would be harmful to her. The day before the sentencing hearing, however, Newman's lawyer delivered a subpoena for her to testify, but delivered it to her father at his house without attempting to find out whether she lived there (she did not). There is no indication that she received the subpoena.

After considering all the evidence, the judge made findings that the information in the presentence report and the testimony of the psychologist were true, and Newman's denials false. Next came the calculation of the sentence. The judge accepted the conclusion in the presentence report that the applicable adjusted offense level was 17 (the level that generated the 24 to 30 month range that we mentioned at the outset of this opinion). The report also advised the judge to consider the possibility of departing upward, and this he did too. He found that the dollar amount of the fraud loss understated the gravity of the crime. (This is an authorized ground for an upward departure in a fraud case. U.S.S.G. § 2F1.1, Application Note 10.) It ignored the psychological harm that Diana had suffered, harm demonstrated not only by the psychologist's testimony but by the fact that the Social Security Administration had found her totally and permanently disabled from gainful employment and had awarded her disability benefits. It also ignored the bodily injury that Newman had inflicted on her. The guidelines allow upward departures for significant physical injury and serious psychological injury, §§ 5K2.2, 5K2.3, and finding both here, the judge increased Newman's offense level by two levels each, for a total of four. The judge made a further four-level upward departure by reference to a provision of the guidelines that permits an upward departure for unlawful restraint in kidnapping and hostage-taking cases. § 5K2.4. He added another four levels by reference to a provision that prescribes such an increase for death threats made in connection with sexual abuse. § 2A3.1(b)(1) and Application Note 2.

These departures raised Newman's adjusted offense level from 17 to 29. But the judge was not through. The presentence report had placed Newman's criminal history in category I, which means no increase in sentence because I is for people who have never been sentenced to a term of imprisonment of sixty days or more. § 4A1.1. Newman had been convicted only in Canada, and foreign convictions don't count. § 4A1.2(h). The judge concluded that a criminal history classification of I did not accurately reflect the seriousness of Newman's criminal record or the likelihood of his committing crimes after his release from prison, and so he reclassified Newman's criminal history, as the guidelines authorize. *Id.* and § 4A1.3. Besides the foreign conviction and many frauds for which Newman either had not been convicted or had not even been prosecuted, the judge pointed to the observation in the presentence report that Newman's whole life appeared to revolve around fraudulent behavior. The judge raised Newman's criminal history classification from I to III. The guidelines range for a level 29 category III offender is 108 to 135 months and the judge picked the approximate midpoint, 120 months.

■ The appeal raises a number of grounds but none has merit, even the one on which the government has confessed error on Chief Judge Baker. *Young v. United States*, 315 U.S. 257, 62 S.Ct. 510, 86 L.Ed. 832 (1942). Newman challenges to begin with the factual findings on which the judge based the upward departures. Newman points out that Diana Scharff did not testify and that the psychologist's testimony was hearsay. But the rules of evidence do not apply to sentencing hearings, Fed.R.Evid. 1101(d)(3); *United States v. Agyemang*, 876 F.2d 1264, 1271 (7th Cir. 1989), and the psychologist's testimony would in any event have been admissible under the hearsay exception for "statements for purposes of medical diagnosis or treatment." Fed.R.Evid. 803(4). Is psychology medicine? For purposes of the rule, it is. The idea behind the rule is that a person who believes that he is or may be ill or injured has a strong incentive to tell the professional from whom he seeks diagnosis or treatment the truth about his medical history, symptoms, etc. because if he doesn't it will be harder for the professional to diagnose his problem and treat it effectively. *Morgan v. Foretich*, 846 F.2d 941, 949 (4th Cir.1988); *Gong v. Hirsch*, 913 F.2d 1269, 1273 (7th Cir.1990); *Meaney v. United States*, 112 F.2d 538, 539–40 (2d Cir.1940) (L. Hand, J.). The rationale applies as forcefully to a clinical psychologist as to a physician, and warrants us in reading "medical" broadly. A clinical psychologist can do everything that a psychiatrist—who in this country is a medical doctor and hence within the core of the medical-treatment exception to the hearsay rule, *State v. Wyss*, 124 Wis.2d 681, 710, 370 N.W.2d 745, 759 (1985)—can do except prescribe medications and (in some states) admit a patient to a hospital. Rule 803(4) has been extended as far as social workers, *United States v. DeNoyer*, 811 F.2d 436 (8th Cir. 1987), though we need not decide in this case whether we agree with that extension.

■ If, moreover, Newman or his counsel had really thought that Diana Scharff would contradict the psychologist's story, they would have made a more serious effort to subpoena her. Handing the subpoena to her father—who had tried to kill Newman—was hardly calculated to get the subpoena to her, especially when it was not done until the day before the sentencing hearing, too late to pursue other avenues should Diana Scharff prove not to be living with her father, as indeed she was not.

■ The judge was not required to believe Newman's denials. The only thing that rang true in his testimony was his confession that he had been a con man most of his life. That confession supported the judge's action in raising Newman's criminal history classification from I to III. Newman's record of convictions was not only misleading concerning the gravity of his criminal history and the likelihood of recidivism, but, in combination with his confession and with the description in the presentence report of his many other frauds, actually perverse. For it showed that he was not only a con man, but a *successful* con man in the sense of one who was rarely caught and would therefore have a strong incentive to resume his life of crime when he was released from prison. Since punishment is discounted by the probability of its being imposed—even a criminal of minimum rationality will prefer to commit a crime that carries a mandatory life sentence if the probability of his being caught and punished is .01 rather than .99—a skillful criminal requires a longer sentence than an inept one to be deterred from committing future crimes. And even if the longer sentence is not justifiable on deterrent grounds—some criminals are very difficult to deter—it may be on incapacitative grounds: it would prevent Newman from committing frauds for a longer period of time than if he were given the standard sentence. *United States v. Molina*, 952 F.2d 514, 519 (D.C.Cir.1992); *United States v. Joan*, 883 F.2d 491, 496 (6th Cir.1989).

Since the incapacitative function of criminal punishment was taken into account by the Sentencing Commission in formulating the guidelines, a judge would not be entitled to jigger a defendant's criminal history because he thought the Commission had underestimated the social interest in incapacitation in deciding on the guideline

range for the crime in question. *United States v. Wolak*, 923 F.2d 1193, 1200 (6th Cir.1991). But we do not understand the judge to have done that. He raised Newman's criminal history score because that score failed to "adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes." § 4A1.3. (*United States v. Saunders*, 957 F.2d 1488, 1492 (8th Cir.1992), is a factually similar case.) The *relevance* of the seriousness of a defendant's past criminal conduct and the likelihood of his recidivating is to both the deterrent and incapacitative functions of punishment. It suggests both that the defendant is more difficult to deter than other offenders are and that imprisoning him is more likely to prevent crimes during the term of his imprisonment—just by taking him out of circulation—than in the case of other offenders.

There is another problem, though, with the district judge's having boosted Newman from criminal history category I to category III. The judge didn't discuss the possibility that category II might suffice to correct the inadequacy of classifying Newman in category I. To insist, as in *United States v. Kennedy*, 893 F.2d 825, 829 (6th Cir.1990), that the judge touch every base on his way to the plate may seem pedantic. But there is a reason for such insistence. The guidelines seek to curtail judicial discretion in sentencing. They cannot achieve this aim if judges are free to make departures from the applicable guidelines range without explanation. The judge explained why category I was too low, but this did not free him to pick without explanation any other category—VI, for example.

■ Nothing is gained by requiring boilerplate recitations, however; so, if it is plain from the district judge's opinion why he skipped a category, his failure to mention it will not compel a remand. (So the Sixth Circuit itself has held, in *United States v. Medved*, 905 F.2d 935, 940 (6th Cir.1990).) The test is satisfied here. Category I is, essentially, a record of no significant prison sentences. Category II is a minimum record; it would be satisfied by one prison sentence of sixty days. § 4A1.1, Application Note 2, and Sentencing Table. Counting Newman's Canadian conviction would have put him into category II. But that would have ignored all the criminal frauds that he had committed for which he had not been prosecuted. A criminal ought not be rewarded for his success in escaping prosecution. The judge quite rightly wanted to take account of Newman's uncharged crimes and this implied departure to a higher category than II. It is not as if III required a long criminal record; it would be satisfied by two prison sentences each of a year and a month. § 4A1.1, Application Note 1, and Sentencing Table. Unlike the situation in *Kennedy*, we know why the judge skipped a category.

■ Newman objects to the adjustment (one that brought him up to, rather than over, level 17) for the exploitation of vulnerable victims. § 3A1.1. It might seem that such an adjustment would be *de trop* in a fraud case—that the whole idea of fraud is to prey on the vulnerable. But while many victims of fraud are indeed vulnerable, in the sense of being far below average in their ability to protect themselves against misrepresentations, not all are. Some are large corporations, or the United States. Newman argues that Diana Scharff was a grown woman and therefore should not be thought a vulnerable victim. However, victims of sexual abuse (the rape when she was 15) often are particularly susceptible to sexual exploitation as adults, see, e.g., M. Gorcey, J.M. Santiago & F. McCall–Perez, "Psychological Consequences for Women Sexually Abused in Childhood," 21 *Soc. Psych.* 129 (1986); Brandt F. Steele & Helen Alexander, "Long–Term Effects of Sexual Abuse in Childhood," in *Sexually Abused Children and Their Families* 223 (Patricia Beezley Mrazek & C. Henry Kempe eds. 1981); Mimi H. Silbert & Ayala M. Pines, "Sexual Child Abuse as an Antecedent to Prostitution," 5 *Child Abuse & Neglect* 407 (1981), and a 20–year–old is hardly an experienced adult well able to resist the lies and threats of a much older person. An experienced person would have spotted Newman for a

phony early on or would at least have been sufficiently wary to demand more tokens of reliability before she left her job than he offered; that Diana Scharff made no demands and did not break away from him on many occasions when she could have done so is evidence that she was peculiarly susceptible to Newman's brand of con artistry. Of course she is not the only person, even in this escapade, whom he took in. He took in her parents for quite a time, and although a farm family they are not alleged to be particularly vulnerable. But the very fact that he had Diana so completely under his domination helped him to defraud her parents and sister and brother-in-law; she became his unwitting accomplice in defrauding her relations.

It is true that the defendant must *know* that his victim is vulnerable in order to be given an extra dollop of punishment. A defendant who sells fraudulent securities to the general public is not subject to a "vulnerable victim" enhancement just because one of the purchasers turns out, unbeknownst to the defendant, to be senile. § 3A1.1, Application note 1; *United States v. Sutherland*, 955 F.2d 25 (7th Cir.1992). But whatever Newman may have thought when he first met Diana Scharff, at some time during their eight-month relationship he must have realized that he was dealing with someone abnormally susceptible to intimidation and deceit. Vulnerability does not require that the victim have a demonstrated physical or mental deficiency. A number of fraud cases, some involving factual patterns comparable to that in the present case, have approved vulnerable-victim enhancements without insisting on evidence—besides the victim's own conduct—of a definite mental deficiency or psychiatric illness. *United States v. Caterino*, 957 F.2d 681, 683–84 (9th Cir.1992); *United States v. Pavao*, 948 F.2d 74, 78–79 (1st Cir.1991); *United States v. Astorri*, 923 F.2d 1052, 1055 (3d Cir.1991); *United States v. Boult*, 905 F.2d 1137, 1139 (8th Cir.1990); *United States v. Altman*, 901 F.2d 1161, 1165 (2d Cir.1990).

The upward departure for threats was clearly proper, though Newman argues not. As for departing for both bodily and psychological harm (and raising Newman's offense two levels for each), rather than merging the forms of harm into a single departure for purposes of assessing the appropriate increase in the offense level, such a merger would, we may assume, be required if the bodily harm were incidental to the psychological—for physical illness is a frequent by-product of psychological injury—or vice versa, for physical injury frequently gives rise to psychological illness. But in this case the physical and psychological harms were separate. The physical harm caused by the administration of potent drugs was distinct from the physical manifestations of psychological injury inflicted by threats, confinement, lies, and rape. There is no double counting in treating these harms as separate grounds for increasing a defendant's offense level to reflect more precisely the actual gravity of the particular offense. Section 2F1.1 of the guidelines authorizes departures in fraud cases when the dollar loss does not fully capture the harmfulness of the defendant's conduct. Section 2A2.2(b)(3)(B) authorizes a four-level enhancement for inflicting serious bodily injury in the course of an aggravated assault, and the combination of bodily and psychological harm in the present case was the equivalent of such an injury. So the judge had more than enough to work with in departing four levels upward on the basis of the injuries inflicted by Newman on Diana Scharff.

The government, however, asks us to remand the case for resentencing because the judge did not consider the possibility of departing upward two rather than four levels for unlawful restraint. He based the four-level departure, as we said earlier, on the restraint provision applicable to kidnapping cases, and did not mention another restraint provision, one applicable to any crime but prescribing a two-level increase rather than permitting an open-ended departure. § 3A1.3. However, no one ever asked the judge to consider the two-level provision. We can remand on this ground therefore only if the judge's failure to consider the provision was a plain error. The government's brief does not

call the judge's error plain. When reminded at argument that we are not authorized to correct errors waived below that are not plain, the government's lawyer pronounced this error plain but it soon became apparent that he did not know the legal definition of plain error. A plain error is not only a clear error but an error likely to have made a difference in the judgment, so that failure to correct it could result in a miscarriage of justice, that is, in the conviction of an innocent person or the imposition of an erroneous sentence. *United States v. White*, 903 F.2d 457, 466–67 (7th Cir. 1990); *United States v. Wilson*, 962 F.2d 621, 627 (7th Cir.1992).

The error here is neither clear, nor likely in fact to have affected the sentence. The sentencing guidelines do not require a judge considering an upward departure to enumerate every provision of the guidelines that might be relevant. The judge may not depart from the guidelines range without justifying the departure in terms of policy choices made in the guidelines. *United States v. Thomas*, 906 F.2d 323, 328 (7th Cir.1990) (per curiam). But of course he may base the departure on a provision expressly authorizing a departure, as he did here. Newman's conduct did involve kidnapping, and the unlawful-restraint provision applicable in kidnapping cases was therefore the natural place to look for a guide to a departure in a case in which kidnapping was not charged. It was at least as natural, as appropriate, as using a catch-all provision, applicable to the full range of federal crimes, which might for example result in a two-level increase because the defendant in the course of taking someone's bicycle in the garage of a federal court had locked his victim in a storage closet for five minutes while he made his getaway. Cf. *Arcoren v. United States*, 929 F.2d 1235, 1246 (8th Cir.1991); *United States v. Tholl*, 895 F.2d 1178, 1184–85 (7th Cir.1990). It is true that a graver restraint than our bicycle hypothetical drew only the two-level enhancement in *United States v. Stokley*, 881 F.2d 114 (4th Cir.1989), but it was nothing like the eight months of physical and psychological restraint in this case. We think it highly unlikely that the district judge would have applied the two-level provision if it had been brought to his attention—which may be why Newman's lawyer didn't bother to.

A ten-year sentence is long in a fraud case involving a modest haul by contemporary standards. But this is an unusual case. The framers of the sentencing guidelines authorized departures from the rule-prescribed sentencing range in cases unforeseen by the framers, and required only that the departures keep within the statutory maxima and be based on policies found in the guidelines themselves rather than in the personal penal philosophy of the sentencing judge. They also preserved most of the evidentiary informality that historically has characterized sentencing. They allowed in short the leeways that justified the sentence in this case.

AFFIRMED.