**UNITED STATES of America, Plaintiff–Appellant,**

v.

**Michael E. STEWART, Defendant–Appellee.**

No. 94–1024.

United States Court of Appeals, Seventh Circuit.

Argued June 8, 1994.

Decided Aug. 24, 1994.

Philip P. Simon, Asst. U.S. Atty. (argued), Dyer, IN, for plaintiff-appellant.

Forrest Bowman, Jr. (argued), Forrest Bowman, III, Bowman, Emery & Hill, Indianapolis, IN, for defendant-appellee.

Before RIPPLE, ALARCON,* and MANION, Circuit Judges.

ALARCON, Senior Circuit Judge.

Michael E. Stewart pleaded guilty to two counts of mail fraud in violation of 18 U.S.C. § 1341 and was sentenced to a twenty-one month prison term. The Government appeals from the order imposing sentence. The Government contends that the district court clearly erred in finding (1) that Stewart had not abused a position of private trust in a manner that significantly facilitated the commission and concealment of the offense within the meaning of section 3B1.3 of the United States Sentencing Guidelines, U.S.S.G. § 3B1.3; and (2) that the elderly persons who were induced to part with their money in response to Stewart's false representations were not vulnerable victims within the meaning of section 3A1.1, U.S.S.G. § 3A1.1. We hold that the district court clearly erred in finding (1) that Stewart's position as a licensed insurance agent did not significantly facilitate the commission or concealment of his fraudulent scheme; and (2) that the funeral directors were the sole victims of Stewart's crime. We vacate the order imposing sentence and remand for a *de novo* sentencing hearing.

I.

Stewart was president and the operator of Pre–Need Services, Inc., an insurance firm specializing in the sale of annuities to the elderly. Stewart induced 316 elderly persons to forward 1.1 million dollars for the purpose

---

* Honorable Arthur L. Alarcon, Senior Circuit Judge for the Ninth Circuit, sitting by designation.

of purchasing annuities to compensate designated funeral directors for performing funeral services. Instead, Stewart converted the money for his own use. Thus, as a direct result of Stewart's fraudulent representations, the funeral directors, who had contractually obligated themselves to perform funeral and burial services, received no compensation for these services.

Stewart accomplished his fraudulent scheme by organizing funeral directors to act as his agents to sell annuities to elderly persons to pay for their funeral expenses. The record shows that the elderly pawns of Stewart's scheme had been advised by state officials that they could purchase "a pre-need funeral" as one means of reducing their financial estates in order to qualify for Medicaid funds for nursing home expenses. The funeral directors represented that the annuity would be used to pay the price of the funeral services selected by the elderly person. The elderly were informed that the cost of the annuity would be less than the actual price of the requested funeral services. The funeral directors also advised the elderly persons that the interest earned on the annuity would be sufficient to compensate the funeral director for these services at the actual cost. Any excess amount would be transmitted to a designated beneficiary.

Stewart provided the funeral directors with forms to be filled out by his prospective clients. In the "Pre–Need Services E–Z Form" (E–Z Form), Stewart requested the client to provide personal and health information.[1] The E–Z Form also required that the "funeral price" and the "amount sent" be filled in and that both the client and the funeral director sign it.

The second form is entitled "Declaration of Irrevocable Trust" form (Trust form).[2] By signing this form, the client designated the State and Savings Bank, Monticello Indiana, as the trustee, and agreed that the funeral director who sold the annuity would perform the funeral services. The trustee was directed to use the proceeds of the policy to pay in full the "contract amount" of the funeral costs, and to deliver any excess funds to the beneficiary designated by the settlor.

The client, with the assistance of the funeral director, was required to fill out the Trust form except for the annuity policy number and the name of the insurance company. After the client signed Stewart's forms and furnished the cost of the annuity, the two agreements and the money were forwarded to Stewart.

Initially, Stewart purchased annuities for approximately thirty-eight of his elderly clients in a face amount substantially less than that which his agents had represented would be provided to cover the actual cost of burial services. Stewart converted the remaining money for his personal use. Thereafter, Stewart converted all of the money entrusted to him for the purchase of 278 annuities.

To avoid detection, Stewart used a pyramid scheme. From the funds received from new clients, Stewart sent money to the funeral directors to provide funeral services for those persons who died before his fraudulent conduct was discovered. Stewart also mailed a letter to each elderly client acknowledging the "receipt of the Funeral Trust papers that [the elderly client] arranged through [the named] Funeral Home."[3] Stewart's letter also confirmed that the "papers" were "being processed," and that the client had placed his or her confidence in "very capable hands" because the named funeral home was "well and favorably known for their ever present concern for the families they serve."

Stewart concealed from the funeral directors the fact that he had converted his elderly clients' funds by sending statements to them that falsely represented that the policies had been purchased. Stewart's obvious intent in sending these statements was to lull the funeral director into the belief that he or she would be compensated for the burial expenses by the proceeds from the annuities.

---

1. The text of the E–Z form is set forth in full in Appendix A.

2. The pertinent text of the Declaration of Irrevocable Trust is set forth in Appendix B.

3. The text of the form letter is set forth in Appendix C.

The pyramid scheme collapsed when the cost of the funeral expenses exceeded the funds provided by the elderly victims of Stewart's scheme. A complaint to a prosecutor in White County, Indiana commenced the investigation that resulted in Stewart's mail fraud conviction.

## II.

In the presentence report, the probation officer recommended that Stewart receive a total offense level of sixteen points. The Probation Department also added eleven points to the six point base offense level for mail fraud because the amount of loss was 1.1 million dollars. U.S.S.G. § 2F1.1(b)(1)(L). Two additional points were added because the offense involved more than minimal planning. U.S.S.G. § 2F1.1(b)(2)(A). Three points were subtracted for acceptance of responsibility.

The Government objected to the presentence report because it did not recommend application of two enhancement provisions that would increase Stewart's offense level by four points. The Government argued that a two-level enhancement was required because Stewart abused a position of private trust pursuant to U.S.S.G. § 3B1.3, and that an additional two-level enhancement was warranted pursuant to U.S.S.G. § 3A1.1 because Stewart's clients were unusually vulnerable due to their age and susceptibility to his fraudulent scheme.

At the sentencing hearing, the parties stipulated that the funeral homes were contractually obligated to provide funeral services to the customers. The parties also stipulated that the only direct contact Stewart had with his clients was the letter that he sent confirming the alleged purchase of the annuity. Finally, the parties stipulated that Stewart was a licensed insurance broker and that this licensure was necessary to enable Stewart to purchase annuities for his clients.

The Government introduced a summary of the data that demonstrates that Stewart falsely represented he had purchased annuities for his clients. The exhibit shows that Stewart did not purchase any annuities for 278 clients and that he purchased annuities for thirty-eight clients in an amount less than that set forth in the written agreement.

Special Agent Walter Valentine of the Federal Bureau of Investigation testified that he determined the ages of 283 clients who were induced to furnish funds for the purchase of annuities by Stewart's fraudulent representations. The median age of Stewart's clients was "in the low 80's. The average age was about 74." Thirty-nine persons were over ninety years of age. Eighty-four were over the age of seventy, and 117 were over eighty years of age. Special Agent Valentine also stated that when Stewart's elderly victims were informed of the fraudulent scheme, they were upset because the money they had advanced to purchase their funeral services had been misappropriated. Burial services have been performed for Stewart's clients who died after paying for an annuity, notwithstanding the fact that the designated funeral directors have not been compensated because Stewart converted the money he received for the purchase of annuities.

The district court refused to apply a two-level enhancement for abuse of a position of trust and a two-level enhancement for targeting a vulnerable victim. The district court adopted the calculation in the presentence report and sentenced Stewart to 21 months in prison. This appeal followed.

## III.

The Government contends that the district court erred in determining that a two-level enhancement under Sentencing Guidelines § 3B1.3 was inapplicable because Stewart did not abuse a position of trust in a manner that significantly facilitated the commission or concealment of the offense. We will uphold the district court's imposition of a sentence "if the court correctly applied the guidelines to factual findings which are not clearly erroneous." *United States v. Kosth*, 943 F.2d 798, 800 (7th Cir.1991).

Under the Sentencing Guidelines, a court must add two offense levels "if the defendant abused a position of public or private trust ... in a manner that significantly facilitated the commission or concealment of the of-

fense." U.S.S.G. § 3B1.3. Application Note 1 states that:

> "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion.... Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily nondiscretionary in nature. For this enhancement to apply, the position of trust must have contributed in some significant way to facilitating the commission or concealment of the offense.... This adjustment would not apply in the case of an embezzlement or theft by an ordinary bank teller....

U.S.S.G. § 3B1.3, Application Note 1.

■ We apply the following two-part test to determine if the enhancement applies: 1) whether the defendant occupied a position of trust; and 2) whether his abuse of the position of trust significantly facilitated the crime. *United States v. Boyle*, 10 F.3d 485, 488 (7th Cir.1993). We review *de novo* the district court's interpretation of the meaning of "position of trust." *United States v. Lamb*, 6 F.3d 415, 417 (7th Cir.1993). Whether Stewart occupied a position of trust is a question of fact, which we review under the clearly erroneous standard. *Boyle*, 10 F.3d at 489.

The determination that a defendant occupies a position of trust within the meaning of section 3B1.3 "depends on whether the defendant has 'access or authority over valuable things.'" *United States v. Boyle*, 10 F.3d at 489 (quoting *United States v. Lamb*, 6 F.3d 415, 421 (7th Cir.1993)). "[T]he sentencing court must look beyond descriptive labels to the actual *nature* of the relationship and the responsibility the defendant is given." *Boyle*, 10 F.3d at 489 (emphasis in original). Application of the enhancement provision "does not turn on simple categories that might be used to characterize the relationship." *Id.*

■ Likewise, whether the abuse of the position of trust significantly facilitated the crime requires a factual determination that the abuse of a position of trust made it significantly "easier to commit or conceal a crime regardless of the success of that abuse." *United States v. Gould*, 983 F.2d 92, 94 (7th Cir.1993) (internal quotations and citation omitted). The abuse of trust "enhancement is concerned primarily with certain factors that make a crime more easy to commit...." *United States v. Kaye*, 23 F.3d 50, 54 (2nd Cir.1994). *See also United States v. Tardiff*, 969 F.2d 1283, 1289 (1st Cir.1992) ("'[P]rimary trait that distinguishes a person in a position of trust from one who is not is extent to which the position provides the freedom to commit a difficult-to-detect wrong.'") (quoting *United States v. Hill*, 915 F.2d 502, 506 (9th Cir.1990)).

■ The district court did not make a finding regarding whether Stewart occupied a position of trust. The district court determined that Stewart's position did not substantially contribute to his crime. The court also found that Stewart did not use his insurance license to facilitate the fraud. The court explained its view of the facts in the following words:

> The question not of saying I'm going to put it with this company or put it with that company and try to, you know, get some bid rigging, it was question of solely saying, "I'm going to get some insurance and never getting it, which is pure out and out theft. Accordingly, the court will not give a two-level increase for abuse of trust....

The district court clearly erred in concluding that Stewart's position of trust did not substantially facilitate the commission of his crime. The evidence is undisputed that Stewart could not have purchased the annuities without being a licensed insurance broker. Stewart used his position as a licensed insurance broker to induce funeral directors to act as his agents for the purpose of selling annuities to elderly clients. For these services, funeral directors were to receive ten percent of the amount paid by the client for the annuity. This amount was in addition to the price fixed for the services requested by the elderly.

Because of his position as a licensed insurance broker, Stewart had access and authority over the funds solicited from his clients. The elderly targets of Stewart's fraudulent scheme entrusted him with their money

based on the representation that the money would be used to pay for an annuity that would fund their funeral expenses. Thus, Stewart's position gave him access and authority over 1.1 million dollars of his clients' money.

In *United States v. Lamb,* 6 F.3d 415 (7th Cir.1993), we reversed a finding by the district court that a postal letter carrier who stole mail did not occupy a position of trust under U.S.S.G. § 3B1.3. *Id.* at 421. We reasoned that a postal letter carrier occupies a position of trust because he is given access to valuable items of mail. *Id.* This reasoning clearly applies to a licensed insurance agent entrusted with his client's funds for the express purpose of purchasing annuities.

We also conclude that Stewart's abuse of his position of trust made it significantly easier for him to commit and conceal his fraudulent scheme. Stewart's licensure enabled him to represent that he had the authority to purchase annuities. Both the funeral directors and the elderly clients relied on Stewart's representation that he would use the funds furnished by his clients to obtain annuities to pay for their funeral services. As set forth above, to conceal the fact that he converted his clients' money, Stewart sent the funeral directors statements falsely representing that the annuities had been purchased. Stewart also mailed letters to his clients in which he falsely represented that he was taking the necessary steps to purchase the annuities.

Stewart argues that the district court correctly concluded that his fraudulent scheme did not qualify for the abuse of trust enhancement because the evidence showed that he merely had a contractual and commercial relationship with the funeral directors. In making this argument, Stewart relies on *United States v. Kosth,* 943 F.2d 798 (7th Cir.1991). In *Kosth,* the defendant used a merchant account at a bank to process orders from customers using credit cards. Kosth fraudulently altered the credit card invoices that he sent to the bank. The bank credited Kosth's account and sought reimbursement from the credit card company. We reversed a district court's determination that Kosth had abused a position of private trust. We

reasoned that Kosth's "arrangement with the bank was the same as that of any other merchant.... There was no special element of private trust involved." *Id.* at 800. We stated that:

> Kosth entered into a contract with a bank which enabled him to collect money from the bank upon presentation of a slip of paper indicating that a customer had purchased merchandise with a credit card. As with all credit transactions, there was an element of reliance present. However, the relationship described by the facts in this case was a standard commercial relationship. The fraud described here does not differ from any other commercial credit transaction fraud. The defendant was not an "insider" of the credit card payment system.... He was an ordinary merchant customer of the bank who committed fraud by abusing his contractual and commercial relationship with it.

*Id.*

In *United States v. Boyle,* 10 F.3d 485 (7th Cir.1993), we distinguished *Kosth* in holding that "the sentencing court must look beyond descriptive labels to the actual *nature* of the relationship and the responsibility the defendant is given." *Id.* at 489 (emphasis in original). We applied the abuse of trust enhancement to the defendant in *Boyle* because "[u]nlike *Kosth,* who was only an account holder at the bank he defrauded, Boyle was an agent of his victims, which entitled him to take possession of funds on their behalf." *Id.*

The defendant in *Boyle* was the president of the Public Armored Car Company (PAC) and responsible for the company's business services. *Id.* at 487. PAC operated as a supplier of coin and currency and a messenger service for various customers. *Id.* PAC collected funds in advance from its customers, in the form of cashier checks, bank account transfers, money orders and currency, which it converted into coin and currency. *Id.* At the direction of its customers, PAC deposited the coin and currency in its vault coin account or stored it at a depository of the customer's choice. *Id.* Boyle intermingled and misappropriated over four million dollars from the Federal Reserve Bank and

Dover's Bank. *Id.* at 488–89. He concealed the crime by signing false daily and weekly reports apprising the Federal Reserve Bank of the total amount of coin stored on its behalf. *Id.* at 488. We held that the two level abuse of trust enhancement applied to Boyle. We explained that "[w]ith total access to and authority over these funds, Boyle was free to manipulate PAC's records and to falsify the inventory statements he prepared for his customers. It is difficult to imagine a position embodying more trust." *Id.* at 489.

Like the defendant in *Boyle,* Stewart had total access to the funds entrusted to him by his elderly clients. Stewart did not enter into a standard commercial relationship with his elderly clients. Rather, "[t]he relationship involved a special element of trust which [Stewart] recognized and exploited to facilitate" his scheme to obtain funds on the false representation that he would use the money to purchase annuities. *United States v. Alex Janows & Co.,* 2 F.3d 716, 722 (7th Cir.1993). Stewart's position as a licensed insurance broker enabled him to induce his elderly clients to entrust him with funds for the purchase of annuities. By paying the funeral directors ten percent for their services as his agents in inducing the elderly to part with their funds for the purchase of annuities, the funeral directors were led to believe that Stewart would purchase the annuities in his capacity as an insurance agent to reimburse them for the cost of the funerals. Stewart abused that position to embezzle over one million dollars. The district court's finding that the two-level abuse of trust enhancement under section 3B1.3 does not apply to Stewart's crime is clearly erroneous.

## IV.

■ The Government also asserts that the district court erred in finding that a two-level enhancement under Sentencing Guidelines § 3A1.1 did not apply because the elderly clients were not the victims of Stewart's crime. Section 3A1.1 provides that "[i]f the defendant knew or should have known that *a* victim of the offense was unusually vulnerable due to age, ... or that a victim was otherwise particularly susceptible to the criminal conduct, increase by 2 levels."

U.S.S.G. § 3A1.1 (emphasis added). "Whether a defendant's victims were 'unusually vulnerable' is a question of fact reversible only for clear error." *United States v. Sutherland,* 955 F.2d 25 (7th Cir.1992) (citation omitted).

■ The district court denied the Government's request for a two-level enhancement on the ground that the funeral directors were the sole victim of Stewart's fraud because they provided burial services for Stewart's deceased clients, notwithstanding Stewart's failure to obtain the annuities intended to cover all funeral expenses. The district court appears to have succumbed to Stewart's argument that section 3A1.1 requires that the vulnerable victim suffer a financial loss. There is no requirement in section 3A1.1 that a target of the defendant's criminal activities must suffer financial loss. Furthermore, by using the words "a victim" of the crime, rather than "the victim," it is obvious that the drafters were mindful of the fact that some crimes have multiple victims. U.S.S.G. § 3A1.1 Some victims may be unusually vulnerable to criminal conduct because of their age. *Id.* Others may be unusually vulnerable because of their physical or mental condition. *Id.*

In *United States v. Newman,* 965 F.2d 206 (7th Cir.1992), we affirmed an upward adjustment in a fraud case where the defendant exploited a twenty-year-old victim, although only her family members lost money they advanced to the defendant on reliance upon his false representation that they would be reimbursed. *Id.* at 207–212. We found that the twenty-year-old victim, who had a history of sexual abuse, was unusually susceptible to the defendant's manipulation. *Id.* at 211–212. By threatening her with harm, giving her massive doses of drugs, and raping her, the defendant made the victim his "unwilling accomplice in defrauding her relations." *Id.* at 212. He induced her to write checks on accounts that had insufficient funds. He then persuaded her parents to make good on the overdrafts by promising that he would reimburse them. *Id.* at 207–08. In *Newman,* as in this matter, the persons who actually suffered a financial loss as a result of

the defendant's criminal conduct were not themselves vulnerable victims. *Id.*

In this matter, Stewart induced funeral directors to agree to provide the funeral services for elderly persons by representing that the money received from them would be used to purchase annuities for that purpose. Thus, as in *Newman,* the defendant in this matter made his elderly clients the innocent instruments of his scheme to defraud the funeral directors of the value of their services.

Our interpretation of the vulnerable victim enhancement has also been adopted by other circuits. *See, e.g., United States v. Bachynsky,* 949 F.2d 722, 735–36 (5th Cir.1991) (patients of doctor convicted of defrauding insurance companies by submitting false paperwork were "victims" for purposes of sentencing enhancement even though the insurance companies suffered the financial loss); *United States v. Yount,* 960 F.2d 955, 956 (11th Cir.1992) (Elderly account-holders who had money misappropriated by bank vice-president were vulnerable victims although bank suffered financial loss as a result of reimbursing the "raided accounts.").

Stewart's scheme targeted elderly clients who were concerned with making adequate financial arrangements for their own funeral services. They furnished funds for the purchase of the annuities sold by Stewart's agents and provided him with information about their age and health status. The evidence supports an inference that Stewart targeted the elderly because he was aware of their concern about providing for their own terminal expenses without burdening their families. Facing the inevitable physical or mental consequences of their own mortality, they were especially vulnerable to Stewart's promise that they could provide for their funeral expenses, and build an estate to pass on to others, if they purchased an annuity at less expense than the fixed price for a funeral.

The district court clearly erred in concluding that the elderly were not vulnerable victims. Accordingly, we must vacate the sentence and remand with instructions that it be enhanced by two levels for abuse of a position of trust and an additional two levels because Stewart preyed on vulnerable victims.

VACATED AND REMANDED.

APPENDIX A
PRE–NEED SERVICES E–Z FORM

SECTION I
NAME _____     SOC.SEC. # _____
ADDRESS _____     PHONE # ( ) _____
CITY _____     STATE _____, ZIP _____
BIRTH DATE _____     BIRTH PLACE _____
OCCUPATION _____

HEIGHT _____ FT. _____ IN.     WEIGHT _____

FUNERAL PRICE _____     AMOUNT SENT _____

PAYMENT MODES:     SINGLE PAYMENT _____
                   ANNUAL PAYMENT _____
                   MONTHLY PAYMENT _____

IF ANNUAL OR MONTHLY,
BILL $_____, FOR _____ (mo./yrs)

SECTION II
PLEASE PROVIDE THE FOLLOWING INFORMATION FOR ALL CLIENTS.
1. HAS CLIENT EVER HAD ANY MAJOR HEALTH PROBLEMS? I.E. CANCER, HEART ATTACK, DIABETES. YES _____ NO _____

2. IS CLIENT NOW TAKING ANY MEDICATION?
   YES _____ NO _____
   IF YES, DESCRIBE AND AMOUNTS

3. HAS CLIENT BEEN TREATED IN A HOSPITAL WITHIN THE PAST 5 YEARS? YES _____ NO _____. IF YES, GIVE REASONS AND DATES.

4. HAS CLIENT USED ANY TYPE OF TOBACCO IN THE PAST 12 MONTHS? YES _____ NO _____

5. WHO IS FAMILY DOCTOR?
NAME _____ PHONE _____
ADDRESS _____
CITY _____ STATE _____, ZIP _____
DATE OF LAST VISIT _____
REASON _____
COMMENTS: _____

SECTION III

SIGNED AT _____, _____, THIS _____ DAY OF _____ 19____.

_____     _____
WITNESS                                        CLIENT
FUNERAL DIRECTOR

APPENDIX B

**DECLARATION OF**
**IRREVOCABLE INSURANCE TRUST**

THIS AGREEMENT made and entered into this _____ day of _____ 19____ by and between _____, Settlor, whose address is _____ and _____ Funeral Home (Beneficiary) of _____, Indiana, and State and Savings of Monticello, Indiana, 47960 (Trustee).

WITNESSETH:

WHEREAS, I, _____, am desirous of making certain·that, upon my death, funds will be available to provide a fitting, respectable, and complete funeral service and burial, and,

WHEREAS, I do hereby agree that the State and Savings Bank, Monticello, Indiana, shall act as Trustee and said bank agrees that it will hold IN TRUST, Policy No. _____ with _____ Insurance Company, which has been arranged through Pre–Need Services (PNS, INC.), in accordance with the instructions contained herein. The Trustee shall be under no obligation to pay the premiums which may become due and payable under the provisions of such policy of insurance, or to make certain that such premiums are paid by others, or to notify any persons of the nonpayment of such premiums, and it shall be under no responsibility or liability of any kind in case such premiums are not paid.

AND WHEREAS, it is my desire that _____ Funeral Home (funeral home FDH # _____), or its successor, shall be employed to conduct all arrangements.

NOW THEREFORE, I do create and Declare this Trust to be established with Policy No. _____, the receipt of which is hereby acknowledged by [the Bank] as Trustee. It is further acknowledged and agreed that it shall be the responsibility of the trustee to have and to hold said Policy for the express purpose of paying funeral costs, and upon my death, to disburse the entire amount of the proceeds of the Policy. After full payment of the contract amount has been made to said _____ (funeral home) or its Successor, or as stated in the Funeral contract, any excess shall be paid to the following person or persons:

Name: _____
Address: _____
City _____ State _____ Zip _____
and forwarded through the Funeral Home less any trustee charges.

. . .

It is agreed that Ten Percent of any annuity deposit, Twenty Percent for life insurance, shall be charged as a service fee by PNS, Inc. It is further understood that Settlor is credited with the total amount of the deposit for the funeral goods and services selected to be provided. For any funeral trust, there is also a one time set-up charge of one hundred dollars.

It is further expressly agreed that this Trust is **IRREVOCABLE** and under no circumstances shall any of the heirs or the Settlor have any control over this Trust. It is further expressly agreed that ONLY the Settlor may change the beneficiary....

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals this _____ day of _____, 19____.

_____                         _____
SETTLOR                                          SOCIAL SECURITY NUMBER

WITNESSES: _____   _____

In consideration of these services to be rendered and merchandise furnished, I hereby deposit with the Funeral Service Provider the sum of $_____.

     Signed at _____, Indiana,
     this _____ day of _____, 19____.

The _____ Funeral Home hereby accepts the foregoing agreement and on its part, in consideration of the same, agrees to render the service and provide the merchandise referred to if available, or similar to and of equal monetary value at the time of need. The Trustee of this account will be the State and Savings Bank of Monticello, Indiana, and it hereby agrees to pay said account to the Funeral Service Provider upon completion of the services listed above plus consideration of Section 5, Item 5, as well as any refund that may be due the Estate of the Settlor or the heirs at law if applicable.

     Signed at _____, Indiana,
     This _____ day of _____, 19____

_____                  _____
Funeral Home                             License #

By: _____                       Title _____

Accepted this _____ day of _____, 19____ at Monticello, Indiana.

STATE AND SAVINGS BANK

_____
Trust Officer

APPENDIX C

PN      PRE–NEED SERVICES
S        A STEP IN THE RIGHT DIRECTION
          101B S. MAIN ST., P.O. BOX 329
          MONTICELLO, INDIANA 47960
          1–800–433–1481
          219–583–8544

August 29, 1990

Dear Ms. _____,

   This is to acknowledge the receipt of the Funeral Trust papers that you arranged through the _____ Funeral Home in _____. The papers are being processed at this time.

The _____ Funeral Home is well and favorably known for their ever present concern for the families they serve. We are certain that you have placed your confidence in very capable hands.

Yours very sincerely,

Michael E. Stewart

Copy: _____ Funeral Home.