**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Steven Paul OLIVER, Defendant–Appellant.**

No. 96–3278.

United States Court of Appeals, Seventh Circuit.

Argued April 7, 1997.

Decided July 17, 1997.

Laura A. Przybylinski (argued), Office of the United States Attorney, Madison, WI, for Plaintiff–Appellee.

David A. Geier (argued), Larowe, Gerlach & Roy, Madison, WI, for Defendant–Appellant.

Before POSNER, Chief Judge, and FLAUM and ROVNER, Circuit Judges.

**564**

FLAUM, Circuit Judge.

Steven Oliver appeals his conviction for kidnapping under 18 U.S.C. § 1201 and for the interstate transportation of a minor for illegal sexual purposes under 18 U.S.C. § 2423 (the Mann Act). Before this court, Oliver argues that the district court's refusal to grant a continuance or, in the alternative, to suppress the DNA and serological evidence, deprived him of the effective assistance of counsel. He further argues that the district court erred at sentencing by departing upwards two levels without a proper evidentiary basis to show that Oliver caused his victim extreme psychological injury. Believing Oliver's trial to have been fundamentally fair, and the departure to have been well within the authority of the district court, we affirm both conviction and sentence.

## I.

Steven Oliver abducted a thirteen year-old girl from Wisconsin and lived with her in a series of Texas motels for three and one half months. He subjected his victim to daily sexual assaults. Tipped off through "America's Most Wanted," the FBI arrested Oliver on December 29, 1995. At the time of his arrest, the FBI conducted an inventory search of Oliver's room in a Houston Days Inn, and articles of clothing and bed sheets thought to be stained with semen were sent to FBI headquarters for evaluation.

Oliver was indicted on January 31, 1996, for both kidnapping and violating the Mann Act. A week later, an attorney was appointed for him. Jury selection and trial were slated to begin June 17. In a letter dated April 29, 1996, the government informed the defense that it intended to use the lab results and expert testimony relating to the garments collected from the motel room. The FBI lab tests, however, were not yet complete; the government kept the defense apprised of its progress and of the qualifications of its experts.

On May 3, the court moved the trial date up to June 3. In part because the test results were not yet available, both parties asked for a continuance. The defense hoped to obtain independent testing, a process which reportedly required two to three weeks at a minimum; in the alternative, the defense sought suppression of the lab evidence. After a hearing, the court moved the trial date a week forward to June 10 and denied the motion to suppress the forthcoming lab reports. Test results still not in hand, the government renewed its motion for a continuance. The defense, perhaps calculating that no test results were preferable to government test results unchallenged by defense testing, contested the motion for the continuance. The district court, relenting slightly on its strict schedule so that both sides could have testing completed, set jury selection and trial for June 24.

As of May 31, the physical evidence was available to the defense for the purpose of independent testing.[1] On June 3, the defense received the government's lab reports. On June 12, the defense sent the evidence to an independent lab to be tested. Trial commenced on June 24. That day and the next, the government put on its case, consisting of testimony from, among others, the victim, the victim's mother, a witness from the Texas motel, and two expert witnesses. Through DNA and serological tests, the government's expert witnesses linked the semen found on the victim's underwear to the defendant, and thus corroborated the victim's testimony of sexual abuse. The defense received its preliminary lab results on June 26, and put on its case, including an expert witness, that very day. The defense's preliminary results were not inconsistent with those of the government: independent tests confirmed that the semen on the victim's underwear was that of the defendant. Oliver's theory of defense with respect to the DNA evidence was that the semen stains on the victim's

---

1. In his appellate brief, Oliver maintains, "That evidence was not given to the defense until 11 June 1996, less than two weeks before trial." A look at the lower court record, however, reveals that the evidence was at least available to the defense, if not in the defense's possession, on

May 31, 1996. On June 3, the trial judge stated, "It appears that you have now had that [the physical evidence], Mr. Geier, at least since Friday and the sooner it gets out to your testing laboratory the perhaps more preparation you'll be able to provide for trial which is on the 24th."

underwear were not a result of intercourse. The jury convicted Oliver on both counts.

After the guilty verdict, reflecting on the cramped nature of the time-frame he had imposed with regard to the DNA evidence, the judge stated, "I'm going to suggest if you have any further concerns with that [handling of DNA evidence] that you do continue to use governmental funds to have the full and complete DNA performed by your expert so that the Court can consider that at sentencing in the event you continue to pursue this issue in this case." Defense counsel, prior to the sentencing hearing, informed the court that the test results came back "inconclusive" and that he had no intention of adding any evidence to the case.

At sentencing, the judge departed two levels upwards based on the victim's psychological pain and injury. The court also departed upwards an additional five levels due to the number of sexual acts committed by the defendant. The court, on it own motion, then departed two levels downward, from 44 to 42, so as to sentence Oliver for a term of years, rather than for life.[2] Oliver was sentenced to 480 months in prison for kidnaping and 120 months, to run concurrently, for the Mann Act violation.

## II.

■ On direct appeal, Oliver pursues a somewhat *counterintuitive strategy.* He argues that he was denied the effective assistance of counsel and thus deprived of his rights under the Fifth and Sixth Amendments. Oliver does not contend, however, that his trial counsel did anything wrong. Rather, Oliver maintains that the trial court's unwillingness to grant a continuance, or in the alternative to suppress the DNA and serological evidence, resulted in his trial counsel's inability to adequately defend the case.[3]

■ Oliver makes his case under *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), in which the Supreme Court describes circumstances so likely to prejudice a trial, that courts should presume a violation of a defendant's Sixth Amendment rights without regard to the prejudice component normally required of Sixth Amendment claims. *See id.* at 657, 104 S.Ct. at 2046. Such a presumption operates when, by reason of process, "'the accused is denied counsel at a critical stage of his trial' or when counsel is present but 'entirely fails to subject the prosecution's case to meaningful adversarial testing.'" *United States v. Morrison,* 946 F.2d 484, 500 n. 3 (7th Cir.1991) (quoting *Cronic,* 466 U.S. at 659, 104 S.Ct. at 2047); *see United States v. Hernandez,* 948 F.2d 316, 319–20 (7th Cir.1991). As the record reflects[4] that Oliver's counsel was present throughout the trial (and no argument has been made to the contrary), we must inquire whether the court's scheduling of trial and admission of the serological and DNA evidence entirely prevented counsel from mounting a meaningful defense to the government's case.

■ Viewed in this light, there is no merit in Oliver's argument. With regard to the admission of the government's lab results,

---

**2.** Once an offense level of 43 is reached, the sentence is life imprisonment regardless of criminal history.

**3.** A more customary route to follow would be to appeal the denial of the continuance or the admission of the evidence. This court has recognized that a trial court's denial of a continuance can be considered an abuse of discretion where the denial impinges on counsel's ability to prepare for trial. *See United States v. Bush,* 820 F.2d 858, 860 (7th Cir.1987). In assessing such a claim, we have traditionally looked to five factors: "the quantum of time available for preparation, the likelihood of prejudice from denial, the accused's role in shortening the effective preparation time, the degree of complexity of the case, and the availability of discovery from the

prosecution." *Bush,* 820 F.2d at 860 (quoting *United States v. Uptain,* 531 F.2d 1281, 1286–87 (5th Cir.1976)); *see also United States v. Blandina,* 895 F.2d 293, 297–98 (7th Cir.1989) (applying *Uptain* factors); *United States v. Studley,* 892 F.2d 518, 522–23 (7th Cir.1989) (applying *Uptain* factors). Oliver's counsel, however, assured the court at oral argument that, rather than appeal a specific ruling, he desired to make a constitutional claim.

**4.** We are able to examine Oliver's claim on direct appeal because his case for ineffectiveness is based entirely on evidence that could be drawn from the record. *See Guinan v. United States,* 6 F.3d 468, 472 (7th Cir.1993); *United States v. Simone,* 931 F.2d 1186, 1194 (7th Cir.1991).

**566**

the actual results, the qualifications of the government experts, and the testing procedures were made available to defense counsel for trial preparation. At trial, Oliver's counsel was able to cross examine both the government's serologist and geneticist. As to the court's schedule, the trial commenced a week later than planned, a delay that allowed the defense to complete preliminary tests. The defense was able to put on its own expert witness, who presented an alternate theory as to how the defendant's genetic matter ended up on the victim's underwear. Moreover, the close timing between the receipt of the preliminary lab results and the commencement of the defense should not have affected the defense's ability to prepare. The semen was either going to be Oliver's or not: trial counsel could have prepared for both contingencies. The only deprivation counsel could point to is that he was unable to have a more extensive DNA test completed.[5] The district court, however, mindful that the defense had not had the opportunity for this more thorough evaluation, expressed its willingness to reopen the record should contradictory evidence come to light. In light of this record, we cannot say this was an instance where the procedures of the district court limited the ability of counsel to present a meaningful defense and thereby rendered the trial fundamentally unfair.[6]

◼ Oliver, in addition to his argument under *Cronic*, makes a straight forward *Strickland* ineffectiveness argument. To prevail under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), Oliver must first establish that his

attorney's advocacy fell below an objective standard of reasonableness, *see id.* at 688, 104 S.Ct. at 2064–65, before we consider whether there was any prejudice, *see id.* at 691, 104 S.Ct. at 2066–67. This claim likewise lacks merit. Oliver's counsel made a couple of decisions that now appear incongruous with his argument on appeal: he delayed two weeks before sending the physical evidence to his independent lab for testing; and he opposed the government's second motion for a continuance. As Oliver maintains that his counsel "was not incompetent"[7] except with regards to matters out of his own hands, we will assume he had his reasons. As to his handling of the lab results at trial, it seems he did the best he could: counsel cross-examined the government's expert witnesses, completed independent preliminary tests, and presented an alternate theory to explain away this very damning evidence. Neither the process of the courts nor the skills of defense counsel can be blamed when the evidence does not go the defendant's way. On an additional note, were we to proceed to the prejudice prong of *Strickland,* Oliver would have difficulty getting around the fact that the more accurate lab results apparently did not exonerate him.

### III.

◼ Arguing insufficiency of the evidence, Oliver takes issue with the district court's two level upward departure under section 5K2.3 of the United States Sentencing Guidelines for the psychological pain caused to Oliver's victim.[8] As evidence for

---

5. Before the district court, Oliver's counsel explained that the government conducted RFLP testing, a procedure that takes five to six weeks and can "bring down the individual to anywhere in one in a billion or something like that." By trial, the defense was only able to complete PCR testing, "which brings it down ... to one in several thousand." Counsel went on to argue that "if there is a conflict between experts as to testing it's my understanding the PCR testing will ... tend to have less weight, I guess, before a jury than the RFLP testing."

6. Oliver also packages this claim as a Fifth Amendment argument: denial of his right to the effective assistance of counsel violated his right to the due process of law. See *United States v. (Under Seal)*, 774 F.2d 624, 627 (4th Cir.1985).

For the reasons expressed above, neither the timing of the trial nor the admission of the DNA evidence deprived appellant of the due process of law.

7. We note Oliver's trial counsel and appellate counsel are one and the same.

8. Section 5K2.3

If a victim ... suffered psychological injury much more serious than that normally resulting from the commission of the offense, the court may increase the sentence above the authorized guideline range.... Normally, psychological injury would be sufficiently severe to warrant application of this adjustment only where there is substantial impairment of

this two point enhancement, the district court relied on a psychologist's report establishing the psychological damage to the victim.[9] Oliver argues that this report is insufficient because it provides no base line showing a "normal" psychological reaction to such a traumatic event with which to compare Oliver's victim's reaction. We review the district court's determination in this regard for clear error. See *United States v. Ewers*, 54 F.3d 419, 420 (7th Cir.1995).

Given section 5K2.3's use of a term of degree in it's opening line, one might expect that a comparative diagnosis be required for a departure under this section. The Guideline, however, hastens to explain that the sentencing court is to apply this provision where it finds "substantial impairment" of an "extended or continuous duration." Other circuits have heeded this explanatory provision and required no statement of a normal reaction with which to compare a victim's plight. See *United States v. Chatlin*, 51 F.3d 869, 874 (9th Cir.1995) ("There is no hard and fast rule establishing the type and quantum of evidence sufficient to meet this burden.") (upward departure warranted where minor victim underwent intensive therapy, feared harm for self and family, and was held back a year in school); *United States v. Anderson*, 5 F.3d 795, 804 (5th Cir.1993) (letter from victim describing substantial changes in her psychological and behavioral functioning sufficient basis on which to depart); *United States v. Ellis*, 935 F.2d 385, 395 (1st Cir.1991) (testimony of counselor that child victim suffered extreme stress, fear of physical harm to herself and her family, and guilt over the sexual abuse sufficient evidence for departure); but see *United States v. Fawbush*, 946 F.2d 584, 586–87 (8th Cir.1991) (victim's participation in therapy and opinion of probation officer insufficient to substantiate upward departure).

Similarly, we have not required a comparative analysis where the evidence revealed substantial psychological damage. See *United States v. Herrera*, 70 F.3d 444, 447 (7th Cir.1995) ("One level of departure on this ground is not problematic, given the uncontested evidence that Cynthia [the victim] required extended psychiatric care."); *United States v. Newman*, 965 F.2d 206, 211 (7th Cir.1992) (threats, confinement, lies and rape sufficient facts to warrant departure for psychological injury). The literal instructions of the guideline, in combination with the above precedent, convinces us that the Sentencing Commission envisioned that no comparative statement be included in evidentiary submissions at sentencing. Moreover, unversed in psychology, this court finds it hard to imagine what a "normal" reaction to being kidnapped and transported across state lines for illegal sexual purposes would be, and is thus strengthened in its conviction that no such evidence is warranted. Accordingly, we cannot say that it was clear error for the district court to rely on a thorough report of a psychologist, which predicted Oliver's victim would suffer "severe personal and interpersonal dysfunction."

For the above reasons, we AFFIRM the judgment of the district court.

---

the intellectual, psychological, emotional, or behavioral functioning of a victim, when the impairment is likely to be of extended or continuous duration, and when the impairment manifests itself by physical or psychological symptoms or by changes in behavior patterns. The court should consider the extent to which such harm was likely, given the nature of the defendant's conduct.

**9.** The district court found that "this thorough report from the psychological evaluator sets forth at length the impact of the victim's past hopelessness and victimization is profound and will be long–lasting. The impact of trauma is likely to be delayed and manifest itself in terms of severe personal and interpersonal dysfunction expected to include an exacerbation of symptoms noted; clinical anxiety, depression and severe symptoms of impaired interpersonal relatedness."