114 F.3d 1192
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff/Appellee,
v.
Thomas MAVRIDIS, Defendant/Appellant.
 No. 96-3474.
 United States Court of Appeals, Seventh Circuit.
 Argued April 30, 1997.
Decided May 22, 1997.
As Amended June 30, 1997.
 
 Before COFFEY, FLAUM and DIAN P. WOOD, Circuit Judges.
 
 ORDER
 
 1
 The defendant, Thomas Mavridis, has been a licensed attorney in the state of Illinois for approximately ten years. Because of his recent felony conviction under 18 U.S.C. § 752 for aiding the escape of a federal prisoner,[1] Mavridis now faces the loss of his freedom, as well as his law license. At sentencing, the government sought a two-level increase in Mavridis's offense level, arguing that Mavridis abused the trust reposed in him as an attorney by smuggling in a saw blade to a county jail in order to assist the escape of a federal inmate. See U.S.S.G. § 3B1.3. The district court agreed and sentenced him to eighteen months' incarceration, the minimum sentence provided by the guidelines for a defendant with criminal history category I and total offense level 15. See U.S.S.G. § 5A (Sentencing Table) (translating into a 18-24 month sentencing range).[2] On appeal, Mavridis challenges his sentence; specifically the two-level increase for abuse of trust. He argues that the evidence was insufficient to support the district court's factual finding that Mavridis secretly provided a saw blade to a federal inmate during an unmonitored meeting in an attorney/client conference room at a county jail--the finding upon which the court concluded that Mavridis abused a position of trust within the meaning of § 3B1.3. Because the district court's finding was not clearly erroneous, we affirm the judgment of the district court.
 
 I. Background
 
 2
 For several years, Mavridis and John Warda held an attorney/client relationship concerning, initially, Warda's real estate purchases, and later, Warda's interest in investing in an oil company called Molly Shield Oil, for which Mavridis was legal counsel. In 1993, Mavridis learned that Warda had been arrested on federal drugs charges and that, while in federal custody, Warda had been shot by a federal marshal. Warda retained Mavridis to investigate the possibility of filing charges against the federal marshal for the shooting incident, and they met on several occasions in a private attorney-client conference room at the Osaukee County Jail. Although Mavridis was not representing Warda on his criminal charges (Warda had a separate defense lawyer), and although Mavridis eventually referred the civil case to another lawyer (Tr. at 333), they purportedly met to discuss the civil case and the oil company investment. Federal authorities began to question the legitimacy of their discussions, however, when Warda, along with another inmate named Amadeo Landa-Mojica ("Landa"), escaped on August 31, 1994 (while Warda was awaiting sentencing on his federal conviction on cocaine conspiracy charges) through a window of the county jail that they cut open using saw blades that someone had smuggled into them. Although Warda and Landa planned to escape on August 30, 1994, they delayed their escape one day due to difficulty in removing the window seal. (Tr. at 127.)
 
 
 3
 Using an undercover agent, the government discovered that Thomas Campion, a guard at the Osaukee jail, provided Warda and Landa with some standard hacksaw blades. (Tr. at 264.) These blades did not ultimately assist the inmates' escape, however, because Warda flushed them down the toilet to avoid detection during a cell shakedown. (Tr. at 265.)[3] Rather, Warda and Landa accomplished their escape by cutting the bolts and rubber seals in Landa's cell window using subsequently-provided blades, including a special type of saw blade used in a Sawzall reciprocating saw.
 
 
 4
 When federal agents initially questioned Mavridis about his client's escape, he denied any knowledge of it and indicated that he was gambling on a river boat on the evening of the escape, but the government could not confirm his alibi. (Tr. at 499.) After further investigation implicated Mavridis, the grand jury of the Eastern District of Wisconsin returned a one-count indictment charging Mavridis with assisting and aiding the escape of a convicted federal felon in violation of 18 U.S.C. § 752(a). At trial, the government attempted to prove that Mavridis aided Warda's escape by providing him with the Sawzall blade and--after the escape--by giving him $350 cash and driving him from Wisconsin to Illinois. Mavridis was convicted by a jury and, at sentencing, the government urged a two-level enhancement in his base offense level pursuant to U.S.S.G. § 3B1.3, arguing that Mavridis abused his position as an attorney by giving a Sawzall blade to Warda while meeting him in the relaxed-security attorney/client conference room at Osaukee. In opposition, Mavridis argued that the evidence was insufficient to support an abuse of trust enhancement.
 
 II. Proceedings Below
 
 5
 At trial, several of Warda's statements made to other Osaukee inmates were introduced in an effort to prove that Mavridis provided Warda the Sawzall blade while privately meeting with him at Osaukee. (Tr. at 118.) First, Timothy Neu testified that Warda told him about his planned escape and showed him both the hacksaw and Sawzall blades. (Tr. at 119.) Second, Tim Ramel testified that two weeks before the escape Warda stated that an unnamed "attorney friend" was bringing him "stuff" to assist his escape and that he smuggled the "stuff" back to his cell by hiding it in his hollowed-out shoe soles. (Tr. at 150, 172.) Notably, Osaukee jail records established that Mavridis displayed his attorney identification card and asked to meet with Warda at Osaukee two weeks before the escape. (Tr. at 598.) Ramel further testified that about a week after Warda told him about getting "stuff" from his attorney, he observed Warda in possession of hacksaw blades. (Tr. at 151, 168.) Ramel also testified that Warda again commented about having his "stuff" shortly after Ramel observed Campion give Warda a newspaper. (Tr. at 162-63.) Finally, Ramel testified that Warda made several phone calls on the day of his escape in an attempt to arrange for someone to pick up Landa and him after their escape.[4] According to Ramel, Warda stated--after hanging up the phone--that "it's a go" and that "his attorney buddy" had "hooked it up." (Tr. at 166.) A third inmate, Richard Hart, similarly testified that on the afternoon of the escape he observed Warda hang up the phone and tell Landa that they had a ride and that his "attorney said everything was okay." (Tr. at 188.) Hart further testified that Warda gave him Mavridis's phone number and told him to call the number if any of the inmates "snitched" about the escape. (R. at 189-92.) To show that Warda was, indeed, talking about Mavridis when he said his "attorney" had arranged for transportation, the government introduced phone records showing that Warda telephoned Mavridis over thirty times on August 30 and August 31, 1994. (Tr. at 598-601.)
 
 
 6
 Campion, the jail guard who pleaded guilty to assisting Mavridis's escape, also testified at Mavridis's trial. Although he admitted supplying Warda with some hacksaw blades about two weeks before the escape (by putting them in Warda's cell inside a folded newspaper), he denied providing the Sawzall blade. (Tr. at 263, 266.) He said he refused Warda's subsequent request for the Sawzall because Warda reneged on his earlier promise to set Campion up with Mavridis for purposes of finding employment for Campion. (Tr. at 264, 266-67.)[5]
 
 
 7
 Warda--who was arrested approximately five months after his escape--also testified at Mavridis's hearing. He denied obtaining any saw blades from Mavridis (Tr. at 367), and instead, claimed that Campion supplied him with all the blades, including the Sawzall (Tr. at 341.) He further explained that he had previously lied to his fellow inmates about his attorney's involvement in order to protect Campion. (Tr. at 368.) Furthermore, he claimed that he duped Mavridis into providing Landa and him with the money and transportation after their escape by calling Mavridis on the day of the escape and telling him to go to the motel near the jail to meet someone else who supposedly would give Mavridis some cash that was ultimately to be delivered to Warda's defense lawyer. (Tr. at 374-75.)
 
 
 8
 After summarizing the above testimony, and specifically noting Warda's denial of getting the Sawzall from Mavridis, the district court acknowledged that the evidence did not prove beyond a reasonable doubt that Mavridis supplied Warda with the Sawzall blade. (Tr., Vol. V at 10.) Still, it concluded that a preponderance of the evidence supported its finding that Mavridis assisted Warda's escape by abusing a position of trust. The district court noted that the Osaukee policy allowing unmonitored contact visits between attorneys and their clients provided Mavridis the opportunity to provide Warda with a Sawzall blade. Moreover, the district court noted that the slit-like compartment in Warda's shoe allowed him to move the blades from the attorney conference room to his cell. In further support of its findings, the district court pointed to Warda's hearsay statements that his "attorney" was getting him "stuff" for his planned escape. Finally, it emphasized that its findings were supported by the evidence showing that Mavridis's last visit to Warda at Osaukee occurred two weeks before the escape, at approximately the same time that Ramel testified that Warda obtained the hacksaw blades. Id.
 
 III. Discussion
 
 9
 The Guidelines provide for a two-level enhancement to a defendant's base offense level "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3.[6] Mavridis does not deny that he occupied a position of trust, or that, because of his special skill as an attorney, he was allowed the privilege--not available to the general public--of privately meeting with Warda in prison.[7] See U.S.S.G. § 3B1.3, comment. (n. 2) (stating that a lawyer is an example of a person with a special skill not possessed by members of the general public). What Mavridis challenges is the factual finding upon which the district court concluded that he abused his special skill or position of trust in a manner that significantly facilitated the commission of his offense--aiding the escape of a federal prisoner. See United States v. Lamb, 6 F.3d 415, 421 (7th Cir.1993) (noting that after determining whether defendant occupied a position of trust the second inquiry is "whether he used that position to commit or conceal his crime"). As previously noted, the district court's basis for applying the abuse of trust enhancement was premised on its finding that Mavridis supplied Warda with the Sawzall blade used to open Landa's cell window.[8] Because Mavridis's sole challenge to his conviction and sentence is premised on his objection to this finding, this court need only determine whether the district court correctly applied the guidelines to factual findings which are not clearly erroneous. United States v. Bailey, 97 F.3d 982, 985 (7th Cir.1996); United States v. Acosta, 85 F.3d 275, 279 (7th Cir.1996); United States v. Townsend, 73 F.3d 747, 751 (7th Cir.1996); United States v. Stewart, 33 F.3d 764, 767 (7th Cir.1994). See 18 U.S.C. § 3742(e) (providing that courts of appeals shall "[g]ive due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous and shall give due deference to the district court's application of the guidelines to the facts"). Under this standard of review, a court of appeals may not hold that the trial judge erred unless it is of the "definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985); United States v. Friend, 104 F.3d 127, 129 (7th Cir.1997). In other words, "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Anderson, 470 U.S. at 573-74.
 
 
 10
 In support of his argument that the district court clearly erred in finding he provided Warda the Sawzall blade, Mavridis notes that no one testified that they actually saw him give Warda any blades, and that Warda himself stated under oath that it was Campion and not Mavridis who gave him the saw blades. At argument, Mavridis asserted that it was inconsistent for the district court to reject this testimony from Warda after accepting Warda's testimony that Mavridis provided the get-away transportation. Mavridis also argues that--instead of rejecting Warda's testimony--the district court should have rejected the testimony of Campion who denied providing the Sawzall blades even though he admitted to providing Warda with the first set of hacksaw blades. (Def.'s Br. at 12-13.) According to Mavridis, Campion's guilty plea to assisting Warda's escape does not make sense unless we infer that he supplied not only the hacksaw blades that were flushed down the toilet but also the blades that actually made the escape possible. Id. Mavridis also points to aspects of Campion's testimony that were contradicted by Ramel, one of the inmate witnesses. In short, Mavridis argues that the district court should have believed Warda's testimony and disbelieved Campion's testimony.
 
 
 11
 This, of course, is a meritless argument because we accord exceptional deference to a district court's credibility determinations. Acosta, 85 F.3d at 28. Therefore, we reject Mavridis's assertion at oral argument that a district court cannot pick and choose the testimony it chooses to believe from a single witness. There is nothing inconsistent in the district court's decision to believe Warda when he testified that Mavridis drove him to Illinois and to then to disbelieve Warda when he testified that Mavridis did not supply him with any saw blades. As noted by the government, Warda knew he could not deny that Mavridis drove him to Illinois because a witness identified Mavridis and Warda together after the escape. This identification did not, however, prevent Warda from attempting to protect Mavridis by denying him as the source of the saw blades. As this court has held countless times, we will not second guess "sentencing judges [who] are fully capable of considering the motivations of witnesses in weighing conflicting evidence." United States v. House, 96-2658, 96-2576, 96-2773, slip op. at 7 (7th Cir. Apr. 8, 1997) (noting that "arguments which simply urge a reassessment of a district court's credibility determination 'are wasted on an appellate court' ") (quoting United States v. Molinaro, 877 F.2d 1341, 1347 (7th Cir.1989)).
 
 
 12
 Although Mavridis appears to acknowledge the deference accorded a district court's credibility determinations, he attempts to circumvent this problem by characterizing his argument as a due process challenge to the district court's failure to resolve conflicting evidence and to base its decision on reliable evidence. (Def.'s Br. at 16.) For support, he points to Acosta, where this court reversed a convicted drug conspirator's sentence because the district court estimated the defendant's relevant conduct without resolving conflicting testimony about the quantity of drugs involved in the defendant's usual purchases, see Acosta, 85 F.3d at 282, and to United States v. Beler, 20 F.3d 1428, 1432 (7th Cir.1994), where we vacated a sentence because the district court failed to reconcile vague and inconsistent estimates of the quantity of cocaine involved in the defendant's transactions. Here, unlike in Acosta or Beler, the district court did acknowledge the conflicting testimony concerning the source of the Sawzall blade. (Tr., Vol. V at 10-11.) It then resolved the conflict after weighing Warda's testimony against Campion's testimony and the other evidence in the record. Thus, Mavridis's reliance on Acosta and Beler is misplaced to the extent that he argues the district court failed to consider the conflicting evidence (Warda's testimony).
 
 
 13
 Mavridis also relies on Acosta and Beler for the principle that factual findings based on unreliable evidence are clearly erroneous. See Acosta, 85 F.3d at 282 (noting that a defendant has a due process right to be sentenced on the basis of reliable evidence); Townsend, 73 F.3d at 751; Beler, 20 F.3d at 1432. Thus, even if we refuse to second guess the district court's rejection of Warda's testimony and its implicit acceptance of Campion's testimony, Mavridis argues that we must still decide whether reliable evidence supports the district court's ultimate finding that he supplied Warda the Sawzall blade. As previously noted, the district court weighed Warda's testimony against his previously made hearsay statements that his "attorney" friend was getting him "stuff" to effectuate his escape, and that his "attorney" friend arranged the escape transportation. Of course, the district court was free to consider these hearsay statements at sentencing so long as the statements were sufficiently reliable. See Beler, 20 F.3d at 1431. The district court noted that the reliability of these statements was enhanced because multiple inmate witnesses heard these same statements at different times in different conversations. (Tr., Vol. 5 at 12.) But Mavridis contends that in this instance Warda's hearsay statements do not constitute a reliable basis for the district court's finding because Warda had more than one lawyer, Mavridis was never identified as that lawyer, and Warda explained that he made up the "story" about his lawyer only to protect Campion. (Def.'s Br. at 16.)
 
 
 14
 Like the district court, we may discredit Warda's "story." But the reliability issue is still open even in view of the enhanced reliability created by multiple testimonies that Warda said his "attorney" was helping him. Recognizing the need to connect "attorney" to Mavridis, the district court noted that Ramel recalled seeing Warda with hacksaw blades about two weeks prior to his escape--a time period that coincided with Mavridis's last visit with Warda at Osaukee. (Tr., Vol. 5 at 13.) Mavridis contends that the district court's reliance on this coincidence is not sufficiently corroborative to satisfy due process because that time period also coincides with the time period that Ramel remembered Warda say "I got my stuff" shortly after seeing Campion hand Warda a newspaper, which Campion had previously used to give Warda hacksaw blades. (Def.'s Br. at 17.) This argument--though perhaps more solid than his others--is unavailing. See United States v. Parker, 25 F.3d 442, 446 (7th Cir.1994) (stating that "where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous") (internal quotes omitted). In addition to the coincidence of Mavridis's visit at Osaukee, the record contains other corroborating evidence, including the phone records showing over thirty phone calls from Warda to Mavridis on the day before and day of the escape, the fact that Warda gave Hart a piece of paper with Mavridis's phone number on it and told him to call his attorney if anyone snitched about the escape, and the fact that the evidence at trial showed that Mavridis drove Warda to Illinois after his escape--contrary to Mavridis's statement to police officers that he was gambling on a river boat at the time of Warda's escape. In addition, the record shows that Warda made a slit in his shoes fit for hiding thin saw blades when moving from the attorney conference room to his cell. As noted by the government, Warda would have had no need for these special shoes if he were getting the saw blades from someone inside the jail such as Campion who passed them to him in folded newspapers. Based on all the evidence in the record, we conclude that Warda's hearsay statements were sufficiently corroborated, and thus, that the district court's reliance on Warda's hearsay statements satisfied due process.
 
 
 15
 IV. Conclusion.
 
 
 16
 Because Mavridis has not demonstrated that the district court's factual findings are clearly erroneous, the application of the two-level enhancement based on U.S.S.G. § 3B1.3 is proper. Accordingly, we AFFIRM the judgment of the district court.
 
 
 
 [1]
 Section 752 provides for a fine and imprisonment (up to $5000 and five years) for anyone who "rescues or ... aids or assists the escape ... of" a convicted felon committed to the custody of the Attorney General. 18 U.S.C. § 752
 
 
 [2]
 Without the enhancement, Mavridis's total offense level would have been 13. Under criminal history category I, he would have faced a 12-18 month sentencing range. See U.S.S.G. § 5A (Sentencing Table). Because Mavridis believes that the district court would have sentenced him at the lowest end of this range, he complains that the enhancement cost him an additional six months' incarceration
 
 
 [3]
 Campion, nevertheless, pleaded guilty to assisting the escape and was sentenced to eighteen months' incarceration. (R. at 267-68.) Although his plea was taken by Judge Warren rather than Judge Curran, he subsequently agreed to testify for the government before Judge Curran at Mavridis's trial
 
 
 [4]
 Although they had arranged for a friend or relative of one of their fellow inmates to pick them up, that plan apparently fell through due to the one day delay of their escape. (Tr. at 136.)
 
 
 [5]
 After Campion confided to Warda about his job dissatisfaction, Warda told him that Mavridis might be able to get him a job at the Molly Shield Oil Company if Campion brought him the hacksaw blades. (Tr. at 338.)
 
 
 [6]
 Given that abuse of trust is not an element of 18 U.S.C. § 752, Mavridis's substantive offense, and that his base offense level was not increased under another guideline based on an abuse of trust, he rightly does not challenge the general applicability of § 3B1.3 to his sentence. See U.S.S.G. § 3B1.3 and United States v. Hathcoat, 30 F.3d 913 (7th Cir.1994) (noting that a § 3B1.3 enhancement may not be applied where its application would result in double counting, such as where the defendant's base offense level already accounts for an abuse of trust or where abuse of trust is an element of the substantive offense)
 
 
 [7]
 According to the policy of the Osaukee County Jail, Mr. Mavridis's status as an attorney allowed him to bring his briefcase into the attorney visiting area and also allowed him to have physical contact with Warda, whereas if he were visiting Warda as a friend or relative rather than an attorney, he would have been behind a glass partition and would not have had the opportunity to pass any contraband to Warda. (PSI at 15.) Moreover, inmates are not searched after contact visits with their attorneys. (Tr. at 170-71, 173-74.)
 
 
 [8]
 Notably, if the district court had applied the enhancement based on Mavridis's alleged conduct of driving Warda to Illinois after his escape, the enhancement would have been improper. To constitute an abuse of trust, "the position of trust must have contributed in some substantial way to facilitating the crime and not merely have provided an opportunity that could have easily have been afforded other persons." U.S.S.G. § 3B1.3, comment. (n. 1); United States v. Dion, 32 F.3d 1147, 1150 (7th Cir.1994). Although Mavridis's ability to privately meet with--and supply contraband to--Warda in jail depended on his being an attorney, see supra n. 7, his ability to drive Warda to Illinois after Warda's escape did not